**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

DR. OMAIDA VELAZQUEZ,                    Case No.: _____

     Plaintiff,

vs.

UNIVERSITY OF MIAMI LEONARD M.
MILLER SCHOOL OF MEDICINE; THE
UNIVERSITY OF MIAMI HEALTH
SYSTEM; AND THE UNIVERSITY OF
MIAMI,

     Defendants.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Dr. Omaida C. Velazquez, the Plaintiff in this matter, was the Department of Surgery Chair

and Surgeon-in-Chief of the University of Miami Health System, the operational name for the

clinical delivery component of the Leonard M. Miller School of Medicine, which is part of the

University of Miami (collectively, "Defendants" or "UM"). On January 12, 2023, Dr. Velazquez's

first day back from protected FMLA leave, Defendants terminated her from her positions as

Department Chair and Surgeon-in-Chief. These actions represent the culmination of a long

campaign of discrimination and retaliation that also included acts such as placing Dr. Velazquez

on an unwarranted Performance Improvement Plan ("PIP"), withholding portions of her

compensation, and threatening to withdraw her medical credentials for baldly pretextual reasons.

Dr. Velazquez brings these claims for race, gender, and national origin discrimination and

retaliation against her employer, UM, under 42 U.S.C. § 1981, as amended ("Section 1981"), Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"), the

Florida Civil Rights Act, Fla. Stat. § 760, *et seq.* ("FCRA"), and Florida's Private Whistleblower's Act, Fla. Stat. §§ 448.101–04 ("FPWA"). Plaintiff further brings claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*, for interference with her protected medical leave and retaliation against her for taking such leave. Finally, Plaintiff pursues common law claims for breach of contract and breach of the covenant of good faith and fair dealing. Plaintiff seeks remedies including reinstatement as Department Chair and Surgeon-in-Chief, back pay, front pay, compensatory damages for emotional distress and related physical harm, punitive damages, and attorney's fees and costs.

## **INTRODUCTION**

1.      From 2015 to January 2023, Dr. Velazquez served as the surgery Department Chair and Surgeon-in-Chief at UM, the highest surgery position at the University and its affiliated health network. Her selection and reappointment to these positions epitomizes the apex of a storied, groundbreaking career marked by numerous firsts. After coming to the United States as a child, Dr. Velazquez became the first Latina to graduate as valedictorian of her medical school class, the first female vascular surgeon hired to the faculty of the University of Pennsylvania, the first woman to receive the Distinguished Surgery Graduate award at UPenn, the first female Chair of surgery to have an endowed chair named in her honor, and the only woman in UM's Department of Surgery to be inducted into the prestigious National Academy of Medicine. These honors represent only a few examples of Dr. Velazquez's myriad professional accomplishments and recognitions over the course of an illustrious, decades-long career in academic medicine.

2.      In 2015, Dr. Velazquez was named as Department Chair and Surgeon-in-Chief at UM, becoming the first Latina to lead a major academic department of surgery in the United States. Yet because of her race, gender, and national origin—along with her complaints of discrimination

and other unlawful activity—UM has cut her career short at its pinnacle. Despite Dr. Velazquez's nationally recognized accomplishments and years of dedication and contributions to UM, she has fallen victim to discriminatory and retaliatory practices by UM's new leaders.

3.       Specifically, Dr. Velazquez discovered that, from the time of her appointment as Chair, she was underpaid as compared to UM's male department chairs. Beginning in or about 2020, UM's new leaders also targeted her for other forms of discrimination and sought to marginalize her and undermine her authority. When Dr. Velazquez complained about this conduct—along with other infractions that raised significant health and safety concerns—UM swiftly and ruthlessly retaliated against her. Until August 2022, UM expressed no issues with Dr. Velazquez's performance and widely heralded her as a model leader. But shortly after she made protected complaints, UM suddenly put her on a baseless PIP, which it has used as pretext to take further actions against her including removing her as Department Chair and Surgeon-in-Chief.

4.        To many on the outside, UM appears to be a leading academic and medical facility. But for Dr. Velazquez, the University has been a vipers' nest of race, gender, and national origin discrimination. When she complained and sought redress, UM leaders launched a vengeful, retaliatory campaign against her because of her protected class status and her willingness to report discrimination and safety violations. Most recently, to cap off its escalating campaign of retaliation, UM removed her as Department Chair and Surgeon-in-Chief and baselessly threatened her medical credentials.

5.       Until UM determined to torpedo Dr. Velazquez's career, her professional standing was impeccable. In 2007, when Dr. Velazquez had already attained early tenure as an associate professor at the University of Pennsylvania, UM recruited her to become the chief of its vascular and endovascular surgery division—the first woman to lead a major surgical division at UM and

to lead a clinical care line across multiple affiliated hospitals.

6.      By 2015, impressed by Dr. Velazquez's service and accomplishments, UM awarded her the title of Chair of the Department of Surgery and Surgeon-in-Chief after a highly competitive selection process. Dr. Velazquez became the first Latin/Hispanic woman in the U.S. to serve as Surgeon-in-Chief and head of a major academic surgery department at a medical school.

7.      In just her first four years in that role (2015-2019), Dr. Velazquez lifted her department from the twenty-seventh-ranked academic department of surgery in the nation to eleventh, according to the National Institute of Health Blue Ridge Institute for Medical Research. She led the department through the considerable challenges of the COVID-19 pandemic, even taking a voluntary pay cut in the process.

8.      Despite these sacrifices and accomplishments, UM consistently underpaid Dr. Velazquez in comparison to similarly-situated men of different races and national origins.

9.      Moreover, Dr. Velazquez discovered that certain high-ranking individuals at UM were committing significant health and safety violations of (i) medical codes, (ii) a Corporate Integrity Agreement ("CIA") that UM had entered into with the U.S. Department of Health and Human Services ("HHS"), and (iii) internal university rules.

10.     Dr. Velazquez reported these violations and her concerns about unfair and unequal pay and other discriminatory treatment through the appropriate internal channels. Then, for no reason other than these protected reports, UM put Dr. Velazquez on a Performance Improvement Plan ("PIP") and made such onerous demands so as to set her up to fail.

11.     As Dr. Velazquez sought an explanation for this extraordinary and adverse treatment, UM tightened the screws. In fact, UM has baselessly threatened not to renew Dr. Velazquez's medical credentials. UM knows that withdrawing or restricting her credentials would

result in serious and irreparable damage to her career and permanently deprive her of a livelihood. It has done this while rubber-stamping the credentials of less-accomplished male doctors with tarnished records including repeated acts of malpractice.

12.     While Dr. Velazquez was out on approved leave under the FMLA, UM continued to retaliate against her by appointing an interim Chair of the Surgery Department—despite Dr. Velazquez's efforts to ensure that the department would continue to operate smoothly while she was away. This was merely a predicate to removing her from the position entirely and replacing her with a non-Hispanic male. Further, while Dr. Velazquez was still out on leave, UM severed the portion of her compensation that she received for serving as Department Chair.

13.     And on the day that Dr. Velazquez returned from pre-approved FMLA leave, UM proceeded to drop the axe without warning—it removed her from her positions as Department Chair and Surgeon-in-Chief, effective immediately. She was ordered to vacate her office and go home that same afternoon before completing her workday. UM sent security personnel to make sure that she vacated her office. Dr. Velazquez was forced to interrupt her educational and clinical duties scheduled for that day. There was no reason for Defendants to remove Dr. Velazquez from the premises in this manner; they did so to publicly humiliate and degrade her.

14.     Within minutes of forcing Dr. Velazquez out of her office in this humiliating fashion, the University sent out an institution-wide communique announcing that she was demoted "effective today." By disseminating this message, Defendants falsely and maliciously suggested that she had engaged in misconduct. UM's primary purpose was to cause her gratuitous harm, malign her reputation, and damage her career.

15.     It has become clear to Dr. Velazquez that the highest echelons at UM operate as an old boys' club, where certain hand-picked candidates, no matter how unqualified or egregious their

records, are promoted at the expense of other more-deserving employees.

16.     In addition to causing Dr. Velazquez economic and reputational harm, Defendants' discrimination and retaliation have negatively affected her mental and physical health—resulting in multiple recent emergency hospitalizations for severe, stress-related conditions. In particular, she has suffered from labile blood pressure, tachycardia, and severe chest pain. Further, Defendants' conduct caused her severe stress and anxiety that resulted in stomach ulcers, a condition known as acute erosive gastritis.

17.     Although no sum could repair the damage to Dr. Velazquez's stellar professional reputation or heal the wounds to her physical and psychological well-being, Plaintiff seeks recompense for the severe harm she suffered with respect to her lost income and earning potential, as well as her ongoing emotional distress and its impact on her personal and professional life.

18.     Further, Dr. Velazquez seeks equitable relief to restore her to the position and compensation that she would be holding but for Defendants' discriminatory and retaliatory conduct, including her rightful titles and compensation.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over Plaintiff's Section 1981, Title VII, and FMLA claims pursuant to 28 U.S.C. § 1331 because these claims arise under 42 U.S.C. § 1981, 42 U.S.C. §§ 2000e *et seq.*, and 29 U.S.C. §§ 2601 *et seq.*, respectively.

20.     The Court has supplemental jurisdiction over Plaintiff's FCRA, FPWA, and common law claims pursuant to 28 U.S.C. § 1367 as these claims arise from a common nucleus of operative facts as Plaintiff's Title VII, Section 1981, and FMLA claims, rendering them so related as to form part of the same case or controversy.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C.

§ 2000e-5(f) because unlawful employment practices occurred in Florida and the events giving rise to the claims occurred in Miami-Dade County.

## THE PARTIES

22.     Plaintiff, Dr. Omaida C. Velazquez, is a United States citizen and resident of Miami-Dade County, Florida. Plaintiff has been employed by UM since 2007 and served as Department of Surgery Chair and Surgeon-in-Chief from 2015 until she was unjustly and unceremoniously removed from these positions in January 2023. Plaintiff is protected by Title VII, § 1981, and the FCRA because:

a.     Dr. Velazquez is female;

b.     She is of Hispanic race and ancestry;

c.     She is of Cuban national origin;

d.     She suffered discrimination because of her gender, race, and national origin;

e.     She engaged in protected activity by objecting to UM's unlawful behavior and adverse employment actions;

f.     Nothing was done to rectify the discrimination; and

g.     As a result of her objection to the illegal discrimination she faced, UM further discriminated and retaliated against her—threatening not just her employment but even her medical credentials.

23.     Defendant University of Miami is a private Florida corporation engaged in the business of owning and operating behavioral health facilities, acute care hospitals, ambulatory surgery and radiation centers, clinical diagnostic laboratories, outpatient clinics, and academic medical centers. It is incorporated in the State of Florida; its corporate headquarters are in Coral Gables, Florida; and it conducts business throughout the United States. UM acted through the

officers, agents, employees, and entities described herein.

24.     At all times material to the Complaint, Defendant Leonard M. Miller School of Medicine was a school within the University for undergraduate and post-graduate medical education. The school included several hospitals, outpatient facilities, laboratories, research facilities, and medical school faculty.

25.      Defendant University of Miami Health System is the operational name for the clinical (patient care) component of the Leonard M. Miller School of Medicine.

26.     During all relevant times, UM was Dr. Velazquez's employer within the meaning of all applicable federal and state statutes.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

27.     Plaintiff is in the process of exhausting her Title VII and FCRA claims with the U.S. Equal Employment Opportunity Commission and Florida Commission on Human Relations. When she perfects exhaustion and obtains a Notice of Right to Sue, she will amend her Complaint.

## FACTUAL ALLEGATIONS

### I.   Dr. Velazquez's Accomplishments and Background

28.     Dr. Velazquez has a captivating personal and professional story. After immigrating to the United States with her family from Cuba as a child, Dr. Velazquez set a course for her education that led to her becoming a world-renowned leader in vascular surgery.

#### a.       Dr. Velazquez's Immigration to the United States

29.     Dr. Velazquez was born in rural Communist Cuba in 1966. Her parents resisted the Communist party and, when she was only 13 years old, Dr. Velazquez stowed away on a boat to the United States during the Mariel Boat Lift. She then began a new life in New Jersey.

30.     When Dr. Velazquez arrived in the U.S., she spoke no English; yet she excelled in

the STEM subjects and, when tested, placed a year ahead of her age group in high school. She mastered English and, three years later, graduated in the top ten of her class.

### b. Dr. Velazquez Rose Quickly Through the Medical-Academic Ranks

31.　Dr. Velazquez excelled in college, attended the Rutgers New Jersey Medical School on a merit-based scholarship, graduated valedictorian, and in turn earned a surgery residency at the elite University of Pennsylvania. In so doing, she became University of Pennsylvania's first female vascular surgeon and its first female recipient of the Distinguished Graduate Award in the department of surgery.

32.　With unmatched speed, Dr. Velazquez climbed from her assistant professor position at the University of Pennsylvania to an early tenured professorship with two patents to her name and funding from the National Institutes of Health.

33.　In 2007, UM's dean, surgery department chair, and president, along with the heads of many other institutions, began to recruit Dr. Velazquez as chief of vascular and endovascular surgery.

34.　Dr. Velazquez was well established at the University of Pennsylvania, but she considered UM's solicitations because her aging parents lived in Miami.

35.　Dr. Velazquez accepted UM's offer and became the Chief of the Vascular and Endovascular Surgery division and was shortly thereafter honored with the David Kimmelman Endowed Chair in Vascular and Endovascular Surgery. She embraced the move, feeling that her career would flourish at UM and Miami could be an ideal community to raise her two young children. She intended to remain at UM until her retirement.

### c. Dr. Velazquez's Selection as Department Chair and Surgeon-in-Chief

36.　Dr. Velazquez excelled at UM. She was the first-ever female chief of a major

surgery division at the school, and other division chiefs, her peers, and personnel throughout the institution embraced her.

37.     Dr. Velazquez focused on her clinical work, research, and students. She secured National Institutes of Health ("NIH") funding every year since 2007.

38.     Dr. Velazquez earned new patents in her field of vascular regenerative medicine and limb-saving technologies, which UM used to establish an exclusive licensing agreement with a biomedical tech company that focuses on developing new vascular treatments and cures. She then won new funding for the ongoing development of the promising new technology and put her and her team's potential life and limb saving discoveries on the path to receiving Orphan Drug status by the U.S. Food and Drug Administration.

39.     In 2009, the University of Miami was proud to announce that Dr. Velazquez was elected to the American Society of Clinical Investigation, an honor rarely bestowed on a surgeon. Dr. Velazquez has written or co-authored more than 150 journal articles, served on editorial boards of three academic journals, and has served on numerous NIH study sections and panels.

40.     In 2012, vascular services were running so well under Dr. Velazquez's leadership that the then-dean, Dr. Pascal Goldschmidt, asked her to take on an additional mission and work 50% as the school's Executive Dean of Research, Education, and Innovative Medicine.

41.     All of these accolades made Dr. Velazquez the perfect candidate to succeed the prior Department of Surgery chair, Dr. Alan Livingstone, when he stepped down in 2015. Dr. Velazquez became not only Department Chair but also, unlike Dr. Livingstone, the first-ever Surgeon-in-Chief at UM and Jackson Memorial Health Systems.

42.     The selection process for the Chair and Surgeon-in-Chief position was highly competitive: a six-to-nine-month national search by an independent committee, guided by a

national search firm, with multiple rounds of interviews. In the last stage, the top choices had to earn the advisory approval of the search committee, key surgical leaders, surgery departmental division chiefs, and the university president at the time, Donna Shalala.

43.    Dr. Velazquez took the honor, receiving what the Dean told her was the unanimous endorsement of the surgery department division chiefs and all other stakeholders.

44.    At the time that Dr. Velazquez accepted UM's offer, she was also on the shortlist of finalists under consideration for the chair of surgery positions at Stanford University and University of Alabama, Birmingham. Miami, however, was her top choice because of her loyalty to the institution and love for the community it served.

45.    Dr. Velazquez became the first Latin/Hispanic woman in the United States to serve as Surgeon-in-Chief and head of a major academic Department of Surgery.

**d.    Dr. Velazquez Excelled as Department Chair and Surgeon-in-Chief**

46.    Dr. Velazquez's leadership as Surgeon-in-Chief was remarkable. In just her first four years (2015-2019), she lifted her department from the twenty-seventh-ranked academic department of surgery to eleventh in the nation.

47.    UM health system recognized her achievements with a seat on the Joint Operational Leadership Team ("JOLT") and by making her the chair of the Workforce Management Committee for Resilience and Recovery.

48.    During Dr. Velazquez's quadrennial review in 2019, the department faculty voted on her retention and by overwhelming majority recommended to UM leadership that she should continue in the role of Chair/Surgeon-in-Chief. The Dean letter announced the reappointment in a letter stating that Dr. Velazquez had received "overwhelmingly positive" feedback.

49.    Dr. Velazquez raised millions of dollars to support the academic mission of UM—

an important part of the chairperson role—and, in 2022, completed fundraising for an over-$3 million endowed chair in her academic department. Shortly thereafter, another grateful family provided more than $4 million in planned giving in honor of Dr. Velazquez and the Department of Surgery. This was a transformative gift that helped the University of Miami reach a $1 billion milestone in philanthropic gift pledges.

50.     Throughout her career, Dr. Velazquez has accrued honor after honor. In addition to the accolades described above, she has been named as a Rutgers-New Jersey Medical School Distinguished Graduate Fellow an officer of the prestigious Southern Surgical Association. In 2021, she was named as Latina Pioneer of the Year, at the Hispanic Women of Distinction Annual Awards. In 2022, she was honored by her childhood hometown of Union City, New Jersey—receiving the City Proclamation and induction into the Union City Board of Education Hall of Fame; she also received the State of New Jersey Senate Citation for Illustrious Medical career and Research in Peripheral Vascular Disease. Just recently, she was inducted into the National Academy of Medicine— becoming one of only seven other faculty members at UM to earn this preeminent honor and the only woman in the UM department of surgery to receive this recognition.

51.     Yet out of discriminatory animus and a retaliatory agenda, UM has cast aside Dr. Velazquez's consistent and unparalleled accomplishments and successes, underpaid her, and is determined to torpedo her career.

52.     As recently as August 23, 2022, UM arranged a ceremony to celebrate Dr. Velazquez by naming a newly endowed chair in her honor. But at the last minute, that ceremony was indefinitely postponed out of discriminatory and retaliatory motives. Instead, UM embarked on an escalating campaign of retaliation against Dr. Velazquez.

II.     **UM's Gender, Race, and National Origin Discrimination**

a.     **UM Has Consistently Underpaid Dr. Velazquez as Compared to Other Similarly Titled and Qualified Employees**

53.     According to UM's IRS Form 990 Schedule J, UM has paid Dr. Velazquez a discriminatory wage throughout her entire time as Chair and Surgeon-in-Chief. In 2015, the year UM awarded her the job, the previous Chair of the Surgery Department, Dr. Livingstone, a Caucasian male, earned a higher base salary and total compensation than what UM paid Dr. Velazquez. UM underpaid Dr. Velazquez even though she had greater responsibilities than Dr. Livingstone, including assuming not only the chair of the largest surgical department but becoming Surgeon-in-Chief for the entire health system.

54.     On top of her lower base salary, leadership has and still determines Dr. Velazquez's performance bonus in an unfavorable manner as compared to the other surgery department chairs, who are all men. In particular, UM calculates other chairs' bonuses based on their entire salary as chair but uses only a fraction of Dr. Velazquez's salary to calculate hers. It does not include certain elements of her compensation—such as her stipend as Chair—in determining the amount of her bonus. This regularly results in lower bonuses than her male counterparts.

55.     In addition, for six out of her seven years as Chair and Surgeon-in-Chief, UM has held back either a portion or all of Dr. Velazquez's bonuses for arbitrary reasons. For example, UM has made high pandemic-era cuts to her compensation despite UM's health system thriving financially and meeting and exceeding budget targets.

56.     Recently, UM withheld Dr. Velazquez's entire merit pool increase while approving it for all other departmental surgical chairs—all men—at roughly 6% of base salary, to be paid retroactively from June 1, 2022.

57.     As of today, UM still has not restored the cuts nor addressed Dr. Velazquez's request for a fair recalculation of her bonus structure.

58.     Dr. Velazquez also receives less than other similar high-ranking and experienced white employees and male employees in terms of special compensation. A key example is the special Y-component incentive system, which rewards high clinical volumes for clinical care providers. Leadership has systematically misinformed and misled Dr. Velazquez and her executive team about this system, insisting that department chairs cannot qualify. Because she was originally told and colleagues have confirmed that department chairs, like her, are ineligible, Dr. Velazquez did not seek this pay until Fiscal Year 2022.

59.     But other chairs who are not Latin women have received these incentives.

60.     Specifically, Chief Operating Officer ("COO") Dr. Dipen Parekh openly boasts that he earns $60,000–100,000 a year under the system.

61.     As a result of these inequities, UM has held Dr. Velazquez's base and total compensation below the fair-market rate while paying her white and male surgical counterparts significantly more than her.

62.     As captured in the 2020–21 Association of American Medical Colleges Faculty Salary Report, Dr. Velazquez's earnings were well below the 50th percentile for her title nationwide. According to UM's publicly filed IRS Forms, this contrasted sharply with her male colleagues' compensation. For example, male chairs of smaller surgical departments, such as Dr. Parekh in Urology and Dr. Fred Telischi in Otolaryngology, earned higher compensation than her and, in contrast, were not paid below-market wages.

63.     Even male employees who do not oversee full departments, but rather smaller, specific specialty services are paid more than Dr. Velazquez. Some of these surgeons even report

to Dr. Velazquez. She is thus paid less than her own subordinates.

64.     Examples include Dr. Nestor De La Cruz (in 2017), Dr. Lee Kaplan (in 2014 and 2018), and Dr. Joseph Lamelas (in 2019). Other examples of male surgical and non-surgical leaders with equivalent or lesser rank and experience who received higher wages include Dr. Rodrigo Vianna, Dr. Leonardo Mulinari, and Dr. Stephen Nimer.

> **b.      UM Has Discriminated Against Dr. Velazquez by Removing Her Responsibilities, Demoting Her, and Undermining Her Position**

65.     UM leadership demoted Dr. Velazquez in January 2023 after years of increasingly punitive actions to dilute her position and set her up for demotion.

66.     From the time that he rose to a position of authority over Dr. Velazquez in 2020, Dr. Dipen Parekh, the COO, engaged in a protracted and ongoing course of conduct to erode Dr. Velazquez's title and standing. Dr. Parekh and other members of UM leadership engaged in an unrelenting discriminatory campaign against Dr. Velazquez.

> #### *i.      Change in the Lines of Reporting to Dilute Dr. Velazquez's Authority*

67.     When Dr. Parekh assumed the COO role, he became one of Dr. Velazquez's immediate supervisors. Dr. Parekh mandated that she report to him directly. However, Dr. Velazquez's offer letter indicated that as Surgeon-in-Chief, she would report to the Dean and CEO. By inserting the COO as intermediary, the new reporting structure created delays and potential safety concerns. This required Dr. Velazquez to oversee the largest surgical enterprise within the health system plus highly specialized units like the organ procurement and transplant immunohistology lab—areas that Dr. Parekh possessed no experience or qualifications to oversee.

> #### *ii.      Naming an Unqualified Co-Surgeon-in-Chief to Supplant Dr. Velazquez*

68.     In 2022, UM promoted another male employee to the functional equivalent (in both position and title) of co- Surgeon-in-Chief. UM systematically stripped away Dr. Velazquez's key

duties and responsibilities and reassigned them to the co-Surgeon-in-Chief.

69.     The norm at other leading institutions, such as at Johns Hopkins University, Yale University, Dartmouth College, Massachusetts General Hospital, Brigham and Women's Hospital, and Beth Israel Deaconess Medical Center, is that there is only one "Surgeon-in-Chief."

70.     Dr. Velazquez's 2015 offer letter expressly states that her titles of surgery Department Chair and Surgeon-in-Chief are "indivisible."

71.     But in April 2022, Dr. Velazquez learned from the director of the Sylvester Comprehensive Cancer Center, Dr. Stephen Nimer, that Dr. Parekh intended to promote oncology surgeon Dr. Nipun Merchant to Surgeon-in-Chief of surgical oncology. Others in UM leadership supported Dr. Parekh's efforts, in complete disregard of Dr. Velazquez's conjoined Department Chair and Surgeon-in-Chief roles. With Dr. Merchant's promotion, several divisions within the surgery department would report to him rather than Dr. Velazquez. Further, Dr. Merchant would act independently of Dr. Velazquez, and be able to dictate decisions and protocol changes on surgical care lines without needing her input or approval.

72.     Before Dr. Merchant's promotion, Dr. Nimer lobbied various faculty members to leave the surgery department and join a new, soon-to-be-created department of surgical oncology with Dr. Merchant as its Chair. The lobbying was not well-received by surgery faculty, some of whom raised concerns to UM leadership. Dean Henri Ford also opposed the idea of dividing the surgery department and starting a separate department of surgical oncology, because there was no precedent at other reputable medical schools. UM acted to elevate Dr. Merchant anyway.

73.     Dr. Merchant and Dr. Parekh are both non-Latino males.

74.     Sometime after Dr. Nimer alerted Dr. Velazquez of Dr. Merchant's impending promotion, leadership promoted Dr. Merchant to the job of "Chief Surgical Officer," a previously

unheard-of title, without conferring with or advising Dr. Velazquez. This action has apparently permitted UM to pay Dr. Merchant a higher salary than Dr. Velazquez for performing equivalent or lesser duties. It also allowed UM the ability to marginalize Dr. Velazquez, eroding her authority over surgical care protocols. Further, elevating Dr. Merchant allowed him to bypass Dr. Velazquez's supervision and instead report directly to Dr. Parekh and Dr. Nimer.

75.     Even prior to Dr. Velazquez's official demotion, UM's unprecedented actions to go out of its way to create a co- Surgeon-in-Chief marginalized her among her peers. The writing was on the wall that she was being supplanted. Some of Dr. Velazquez's colleagues would ask her "what is it exactly that the 'Chief Surgical Officer' does and how is it different than your role as Surgeon-in-Chief?" Moreover, Dr. Velazquez was overtly excluded from matters integral to the surgical care lines, signaling to many across the system that her authority was in question and that she would be superseded by Dr. Merchant. In other words, rather than directly replacing her as Surgeon-in-Chief, UM created a new, parallel title for Dr. Merchant and shunted Dr. Velazquez's responsibilities to him. This maneuver affected Dr. Velazquez's reputation and standing both within the UM community as well as the field of academic medicine nationwide.

76.     According to Dr. Nimer, after being elevated to co- Surgeon-in-Chief, Dr. Merchant would earn an even higher base salary than Dr. Velazquez.

77.     UM elevated Dr. Merchant in order to undermine Dr. Velazquez and ultimately replace her as chair and Surgeon-in-Chief. Its actions served to dilute Dr. Velazquez's standing and are yet more evidence of discrimination.

78.      Dr. Merchant is simply not qualified for Dr. Velazquez's position, especially as compared to her. Dr. Velazquez's medical record is pristine whereas Dr. Merchant's is compromised by certain misconduct and professional error.

79.     Dr. Merchant has also committed policy violations and was the subject of behavioral complaints from nurses and colleagues.

          ***iii.***   ***UM Responded to Dr. Velazquez's Complaints of Discriminatory Treatment by Levying False Reports Against Her***

80.     After learning of Dr. Merchant's impending promotion, Dr. Velazquez sought clarification from the CEO, Joseph J. Echevarria. Around the end of April 2022, Dr. Velazquez contacted the CEO and expressly objected that she was being mistreated because she is a woman.

81.     The CEO acknowledged receipt of this communication.

82.     Dr. Velazquez has also directly notified Dr. Parekh of her concerns about Dr. Merchant and her desire for more patient-centric oversight. In response, Dr. Parekh chastised her behind closed doors (to UM officials Dean Ford and head of HR Allison Mincey) and falsely maligned her complaints of wrongdoing as "poor leadership."

83.     Dr. Velazquez later learned from Ms. Mincey that Dr. Parekh presented her with a list of false complaints against Dr. Velazquez. Yet, Dr. Parekh never met with Dr. Velazquez about these complaints and Ms. Mincey never interviewed Dr. Velazquez about his purported concerns. Instead, the University launched a punitive PIP and a series of unwarranted attacks on Dr. Velazquez's employment and professional standing.

## III.     UM's Retaliation Against Dr. Velazquez for Her Protected Activities

84.     Dr. Velazquez engaged in the protected conduct of reporting her discriminatory pay and the erosion of her title for discriminatory reasons. She also reported significant health and safety violations that could have harmed patients and staff. These reports included: (1) in January 2021 and again in July 2022, reporting safety concerns involving Dr. Merchant's medical errors; (2) in April 2022, reporting safety concerns when Dr. Parekh attempted to force a doctor to open a clinic that was closed and not properly staffed in order to seek special treatment for Dr Parekh's

wife; (3) in late-July 2022, reporting the false allegations made by Dr. Parekh in the recredentialing process of a surgeon and Dr. Parekh's actions in ultimately forcing that surgeon to resign; and (4) in February and August 2022, reporting her discriminatory pay. UM retaliated against her for engaging in protected conduct by putting her on a PIP and subjecting her to increasingly adverse work conditions. Ultimately, UM removed Dr. Velazquez as Department Chair and Surgeon-in-Chief and has threatened to withhold her medical credentials.

85.     In taking these adverse actions, UM not only retaliated against Dr. Velazquez for her complaints but discriminated against her for engaging in protected conduct that it would have accepted from a male employee. UM did not undertake similar adverse actions towards men who raised safety or policy violations, but could not tolerate pushback from an outspoken Latina.

### a.     Dr. Velazquez Faithfully Reported Safety and Policy Violations to Leadership as Required by a Corporate Integrity Agreement

86.     The University of Miami is subject to a CIA formed in settling False Claim Act allegations with the HHS in 2021.

87.     Under the CIA, UM was required to establish a compliance office and committee. It is also required to "develop and implement written policies and procedures regarding the operation of its compliance program," which are to be made available to all eligible employees.

88.     Dr. Velazquez was aware of these policies and participated in mandated training. She understood that under the CIA, she had a duty to report any potential violation of law and that the University was prohibited from retaliating against her for any such disclosures.

### 1.     Dr. Velazquez Reported Safety Concerns About Dr. Merchant

89.     A Code 15 (also known as a "never-event" or major serious adverse event) refers to major, adverse medical events for which hospitals are required to notify medical boards and reporting agencies as well as the affected individuals.

90.     In her role as Surgeon-in-Chief, Dr. Velazquez learned of at least eight possible Code 15 incidents involving Dr. Merchant between 2018 and 2022 that were not properly reported.

91.     UM either never reported each instance or omitted the name of the responsible physician. Many of these incidents constituted gross medical error, and others involved ethical and procedural violations.

92.     In January 2021, Dr. Velazquez sent an email reporting some of the more recent incidents involving Dr. Merchant to Steve Stark, the head of risk management, out of concerns for patient safety and as she believed that the CIA required her to do. The office never replied other than to acknowledge receipt of the email.

93.     Dr. Velazquez raised these concerns at other times with Dean Ford of the medical school, the health system's CEO, and UM's general counsel.

94.     In July 2022, at credentialling committee meetings and Medical Executive Committee ("MEC") meetings, Dr. Velazquez again expressed concerns about these incidents.

95.     Dr. Parekh responded to Dr. Velazquez by saying that the errors were "minor" and not out of the ordinary for a surgeon with Dr. Merchant's clinical volume—although Dr. Merchant's volume was not particularly high. Despite these serious concerns, Dr. Merchant was recredentialed without issue. Thereafter, the hospital refused to share certain safety and medical reports with Dr. Velazquez that she was entitled to in her role as Department Chair/ Surgeon-in-Chief, preventing her from exercising her oversight function.

 2.     **Dr. Velazquez Reported Safety Concerns Involving Dr. Parekh Seeking Special and Unsafe Medical Care for His Wife**

96.     On Sunday, February 20, 2022, Dr. Velazquez received an email from Dr. Michael Peleg, division chief of oral maxillofacial and dentistry surgery, which is within her department.

97.     Dr. Peleg told Dr. Velazquez that Dr. Parekh had just called him and asked him to open an unstaffed ambulatory clinic to perform surgery on Dr. Parekh's wife's abscessed tooth. Dr. Peleg told Dr. Parekh that he did not have the required personnel on a Sunday morning, it would be unsafe for him to provide treatment under the circumstances, and the hospital's emergency room was a preferable option. Dr. Peleg later conveyed that Dr. Parekh mistreated, threatened, and intimidated him because of his principled refusal to perform an unsafe procedure.

98.     Dr. Peleg promptly reported the incident to Dr. Velazquez, his superior, and to the department's senior administrative officer.

99.     Abiding by both UM policy and the CIA's compliance procedures, Dr. Velazquez immediately notified Dean Ford and the CEO of these events as they had been reported to her.

100.    The CEO did not answer until the next day, when he stated that he would have no direct role in the matter.

101.    Dean Ford replied by advising Dr. Velazquez that Dr. Parekh was irate and that Dr. Parekh intended to have his wife file a letter of complaint against Dr. Peleg. The Dean further warned that relaying Dr. Peleg's concerns further would be bad for Dr. Velazquez politically.

102.    Despite this admonition, Dr. Velazquez emailed the Vice President of the compliance office, Blanca Malagon, in accordance with CIA rules and informed the CEO.

103.    Several days later, Dr. Velazquez learned that the compliance officer was not investigating Dr. Parekh's conduct but, instead, whether *Dr. Velazquez* violated the rules by making her reports. The Head of Faculty Affairs further informed Dr. Velazquez that Dr. Parekh remained volatile and blamed her for reporting him.

     **3.**     **<ins>Dr. Velazquez Reported Dr. Parekh's Extraordinary Intervention and Misrepresentations Regarding Another Surgeon's Recredentialing</ins>**

104.    In late-July 2022, Dr. Velazquez participated in a recredentialing meeting for a

surgeon and faculty member, Dr. Gustavo Leon, a Latino male.

105.    After reviewing Dr. Leon's record, Dr. Velazquez and Dr. Jose Martinez, chief of Dr. Leon's division of general surgery, recommended to the UM Credentialing Committee that Dr. Leon should be recredentialed. This recommendation was then advanced to the Medical Executive Committee (MEC), co-led by Dr. Parekh. At the MEC meeting, Dr. Parekh ignored Dr. Velazquez's request for a formal vote as well as her concerns that the process was atypical and that Dr. Leon was being treated inequitably and contrary to protocol. The MEC meeting concluded without a formal vote on the matter as Dr. Parekh blocked any vote and demanded further investigation.

106.    A week later, Dr. Velazquez learned that the UHealth Board of Directors reviewed Dr. Leon's re-credentialing process, and that Dr. Parekh must have grossly misrepresented the events from the MEC meeting to the Board. The Board decided that Dr. Leon should be summarily suspended, effective immediately. To be clear, there was no official MEC recommendation because Dr. Parekh blocked any vote.

107.    In late-August, head of risk management Steve Stark strongly urged Dr. Velazquez to convince Dr. Leon to resign instead of appealing the suspension, as was his standard right as a member of the hospital staff. Mr. Stark asserted that Dr. Leon "is not real faculty, he has no rights." When Dr. Velazquez resisted, Mr. Stark told her that she "wouldn't want to die on this hill." Mr. Stark's aggressive treatment toward Dr. Velazquez in this situation was unlike how he acted towards any other department chair and is itself discriminatory. Male and non-Latino faculty members were frequently able to raise similar concerns and objections without repercussion.

108.    Soon after, Dr. Velazquez attended a special MEC meeting regarding Dr. Leon. Dr. Parekh co-led the MEC meeting and shared the news that Dr. Leon had "voluntarily" resigned.

Dr. Parekh cited highly unreliable data to justify the decision. He detailed a completely new process for re-credentialing investigations that applied only to Dr. Leon.

109.     Dr. Leon has since filed an EEOC claim for age and disability discrimination and constructive discharge based on these events.

110.     Dr. Velazquez's principled resistance to Dr. Parekh's policy violations during this episode constituted further protected activity. As a result of her reports, Defendants discriminated against her as a woman who failed to conform to traditional gender stereotypes under which she was expected to be meek, compliant, and not challenge male UM leaders.

### 4.      **Dr. Velazquez Reported Her Discriminatory Pay and Mistreatment**

111.     As described above, UM has underpaid Dr. Velazquez as compared to male doctors of similar title and experience. Further, Defendants supported Dr. Merchant's promotion to co-Surgeon-in-Chief in a way that effectively eroded Dr. Velazquez's title and authority. Dr. Velazquez complained that these actions were unjustified and discriminatory.

112.     On April 20, 2022, Dr. Velazquez shared her concerns about Dr. Merchant's promotion with the CEO by text message. Specifically, Dr. Velazquez protested that she was being penalized for being female and that Dr. Merchant was being treated more favorably because he was male. The CEO responded that no such promotion would happen without his involvement.

113.     On August 12, 2022, leading up to her annual evaluation, Dr. Velazquez emailed Dean Ford, Dr. Parekh, Human Resources Chief Alison Mincey, and the CEO of her concerns about being underpaid compared to the male department chairs and her intent to request a pay raise and to seek equitable treatment in terms of bonuses and incentive pay.

114.     Dr. Velazquez's complaints of discriminatory treatment, along with her many reports of safety and ethical violations, establish an indisputable record of protected conduct.

**b.** **Dr. Velazquez's Direct Supervisor Dr. Parekh and the Broader UM Leadership Retaliated Against Her for Her Legally-Protected Conduct**

115.     After Dr. Velazquez made multiple reports of discrimination and serious safety violations, and within days of complaining about her underpay to UM leadership, Dr. Parekh—still fuming over Dr. Velazquez's complaints and reports—influenced UM leadership to retaliate against her for her protected conduct.

### 1. The University's August 25th Retaliatory Performance Review

116.     As described above, despite Dr. Velazquez's exceptional performance, her base salary and incentive pay were unfairly low compared to her male surgical counterparts. Further, salary cutbacks imposed on her during the pandemic were never restored.

117.     Because 2022 had been a banner year for the surgery department performance-wise, Dr. Velazquez determined that her upcoming fiscal-year chair evaluation review would be the right time to seek redress for these financial shortcomings. Dr. Velazquez meticulously prepared documents detailing her many accomplishments, including an assessment of the surgery department's performance using the medical school's own templates; she then emailed these materials to UM leadership in advance of the review meeting.

118.     On August 25, 2022, Dr. Velazquez attended the evaluation review meeting, which was conducted by Dr. Parekh, Dean Ford, and Alison Mincey from HR.

119.     Ms. Mincey's presence was unusual because HR typically has little to do with tenured faculty like Dr. Velazquez and particularly so at annual evaluations of department chairs. Most unprecedented, however, was that the meeting did not cover any of the FY 2022 annual pre-established objective metrics that Dr. Velazquez had carefully prepared following UM templates. The meeting completely disregarded the evaluation processes outlined by the UM Faculty Manual.

120.     Within moments, HR Chief Ms. Mincey took control and announced that the

UHealth Board of Directors had lost confidence in Dr. Velazquez's leadership.

121.    Ms. Mincey said more than once that Dr. Velazquez was "misaligned with leadership" and had acted "inappropriately and relentlessly" in public meetings, which referred to Dr. Velazquez's participation in protected conduct. Dr. Velazquez's protected activity was unwelcome to defendants, protected activity which included Dr. Velazquez's objecting to the discrimination she was suffering at UM.

122.    The attendees also referred directly to Dr. Velazquez's reports of policy infractions to UM leadership.

123.    UM would not have criticized or penalized a male Department Chair for raising complaints and reports of illegal and improper conduct and would not have characterized his attempts to ensure that the University complied with the law as "inappropriate" or "relentless."

124.    Ms. Mincey and Dr. Parekh accused Dr. Velazquez of bypassing the chain of command and writing to leadership about "trivial matters." They were referring in particular to: (a) Dr. Velazquez's communications with the president about a recently postponed ceremony that had been meant to honor her but was withdrawn for discriminatory and retaliatory reasons; and (b) complaints to the CEO about Dr. Parekh's discriminatory efforts to demote her and about Dr. Parekh's threats against Dr. Peleg. In sum, they attacked her for engaging in protected conduct.

125.    When Dr. Velazquez tried to defend herself, Ms. Mincey interrupted sharply, saying, "this is not a debate, you are here to just listen."

126.    At the end of the meeting, Ms. Mincey announced that the University was putting Dr. Velazquez on a 90-day PIP, which was to begin immediately. While Ms. Mincey had certain documents in her possession from which it appeared she was reading, she did not provide any documentation to Dr. Velazquez at any time during this meeting.

127.     Across the medical field, it is highly unusual if not unprecedented for a Surgeon-in-Chief to be placed on a PIP. Here, Dr. Velazquez was cherished by UM faculty and leadership and repeatedly proclaimed as a successful leader up until UM determined to retaliate against her. In fact, by August 3, 2022, UM announced a ceremony to honor Dr. Velazquez and name an endowed chair after her and circulated the invitations widely. By August 11, 2022, UM President, Dr. Frenk, UM Provost, Dr. Duerk, and UM Miller School Dean, Dr. Ford had pre-circulated laudatory speeches praising her. Only in response to Dr. Velazquez's complaints did the University suddenly change its tune, canceling the ceremony and initiating an unwarranted PIP.

128.     All aspects of the performance review were at odds with how such reviews are normally conducted. The UM Faculty Manual states that quadrennial chair reviews are performed by the UM Faculty Senate following a predetermined, unbiased, and anonymous survey process that samples input from the entire department and key stakeholders and leaders across the institution. The Dean of the medical school and university President then rely on these surveys to guide their assessments. This ensures that chairs are evaluated through an unbiased process.

129.     UM arbitrarily changed this chair evaluation process for Dr. Velazquez to fit its retaliatory and discriminatory motives. Specifically, UM initiated the process one year ahead of schedule in order to target Dr. Velazquez. UM arbitrarily eliminated involvement of the UM Faculty Affairs Office and Faculty Senate. UM also excluded the usual global input by eliminating the survey process. UM permitted Dr. Parekh and Ms. Mincey to arbitrarily change the process based on an unfounded and pretextual narrative advanced by Dr. Parekh. In short, UM removed all of the protections in place to ensure that Dr. Velazquez received fair and equal treatment, enabling them to steamroll through a desired result that did not accord with her actual performance.

130.     Defendants' retaliatory and unwarranted PIP is fatal to Dr. Velazquez's reputation

and career. Defendants ultimately exploited the PIP to deny Dr. Velazquez her rightful compensation and remove and replace her as Department Chair and Surgeon-in-Chief. They have deliberately destroyed Dr. Velazquez's career and sought to make her unemployable.

## 2. **UM's Retaliatory Conduct After Dr. Velazquez Retained Counsel**

131.    Immediately after the August 25 evaluation review, Dr. Velazquez retained attorneys to represent her on discrimination and retaliation claims. Counsel promptly notified UM that Dr. Velazquez asserted and intended to pursue these claims. This constituted additional protected activity on the part of Dr. Velazquez. Further, Dr. Velazquez, through her attorneys, sought clarification about UM's intentions and an agreement to cease any ongoing retaliation.

132.    While Dr. Velazquez sought to preserve her career, UM has demonstrated that it is bent on destroying it. In response to Dr. Velazquez's protected activity, UM has engaged in a series of acts evincing its intent to force her to resign and to sully her professional reputation.

### A. *Imposition of the PIP*

133.    On September 15, 2022, Ms. Mincey insisted on meeting with Dr. Velazquez and presented her with the written terms of the PIP.

134.    The PIP listed four "Performance Areas that Must be Improved/Addressed" and corresponding "Action Items," all of which were premised on misrepresentations and would require additional weekly work hours. It created new performance metrics that did not apply to anyone else. Most unprecedented, the retaliatory PIP was used by UM to retrospectively withhold bonus pay to which Dr. Velazquez was entitled—she had already fully earned the bonus by meeting and exceeding all of the objective metrics in place for the relevant bonus period.

135.    It was also clear that each item was designed to retroactively rewrite the supervisory rules for Dr. Velazquez, requiring her to ask for Dr. Parekh's blessing for even minor decisions.

136.    Dr. Velazquez already worked 14-hour days or longer. If enforced, the PIP would require more of her time than any person is physically capable of delivering.

137.    The PIP would have undermined Dr. Velazquez's operation of the Surgery Department, fostered inefficiency, and fueled discontent among her staff. The PIP was also meant as a predicate for further actions to rob her of her title and impose severe professional harm.

138.    After Dr. Velazquez initially declined to participate in revising the PIP or to sign it—based on its factually-inaccurate premise and the negative impact it would have on her performance and responsibilities—UM continued to increase its demands on her.

139.    In a letter UM sent on October 12, 2022, UM told Dr. Velazquez that it would require her to participate in a "360-degree analysis." UM would also require meeting with, receiving coaching from, and being reviewed by Dr. Parekh—the very person whom Dr. Velazquez complained engaged in a pattern of discriminatory and retaliatory conduct against her.

140.    In an email of October 25, 2022, UM dug in on a portion of the PIP, asking Dr. Velazquez to choose from three external coaches to instruct her "regarding leadership style and proper means and methods of positively interacting with staff, colleagues and management." Dr. Velazquez responded by proposing a subset of the PIP's requirements that she could agree to without neglecting her core duties. She conveyed to UM, as she had previously, that full compliance would undermine her ability to meet her required duties. UM did not respond.

141.    Instead, UM sent a "PIP check" on November 10, 2022, reiterating the entire PIP based on of all the false assumptions it contained and asking for compliance updates, even on portions of the PIP that Dr. Velazquez specifically challenged because of their negative collateral impact. Even though Dr. Velazquez asked Dr. Parekh and Dean Ford for time to set up monthly meetings as required by the PIP, UM falsely stated that she had made no such efforts.

142.     Maintaining the inaccurate premise of the PIP, on November 8, 2022, UM informed Dr. Velazquez that while other department chairs' annual incentive pay would be released promptly, her bonus would be withheld until she successfully completed the PIP. But, Dr. Velazquez had already fully earned her bonus by meeting all pre-established objective metrics for the relevant work period of UM fiscal year 2022 (June 1, 2021 to May 31, 2022). Using a bogus PIP—first mentioned on August 25—to retroactively deprive her of compensation to which she was entitled for a prior, completed term is plainly retaliatory and done in bad faith.

**B.     Blocking Dr. Velazquez's Medical Recredentialing**

143.     On or about November 10, 2022, UM took the unprecedented step of threatening to interfere with Dr. Velazquez's medical recredentialing by reporting that she was not meeting her clinical volume expectations. However, her clinical volumes were not significantly different from prior years when her credentials were renewed without issue; nor were they out of line with other UM leaders with significant administrative responsibilities. Further, clinical activity at UM was generally reduced during the COVID-19 pandemic. In short, UM singled out Dr. Velazquez based on a single metric that it did not typically enforce—while routinely granting full credentials to male employees who committed far more serious transgressions.

144.     Based on discriminatory and retaliatory motives, the MEC recommended to the Board that Dr. Velazquez's medical recredentialing proceed as a Focused Professional Performance Evaluation ("FPPE") with proctoring (i.e., close monitoring and supervision) rather than as a routine Ongoing Professional Performance Evaluation ("OPPE"). Dr. Velazquez has been recredentialed under the less-onerous OPPE designation for all previous cycles at UM, including the last two cycles in her position as Chair and Surgeon-in-Chief. The FPPE process places needless restrictions on her practice, including not being able to perform unsupervised

surgeries, and is greatly harmful to her reputation with colleagues, patients, surgery trainees, and other potential employers. Dr. Velazquez would need to disclose these restrictions as part of informed consent practices. Patients and colleagues come to Dr. Velazquez because she is at the pinnacle of her field; if she cannot perform surgery on her own, her practice will wither and die.

145.    Given her extensive non-clinical duties, Dr. Velazquez's assigned clinical effort target for Fiscal Year 2022 was 13%. Dr. Velazquez significantly exceeded this goal, even earning some clinical special pay. This clearly warranted renewal of her full credentials, but UM was determined to retaliate against and punish her. In all previous cycles, Dr. Velazquez was recredentialed without restrictions or proctoring despite having a similar clinical volume level. The only difference now is that she complained internally about UM's discrimination, safety violations, and retaliation.

146.    The FPPE recommendation (entailing newly instituted monitoring and supervision) is contrary to the MEC's practice with respect to other executive physicians. UM routinely disregards low volumes for the purpose of recredentialling when physicians have other significant, non-clinical responsibilities and meet all other requirements, like Dr. Velazquez does. Volume level is even less relevant for this past cycle, which saw pandemic-related reductions in elective surgeries and support-staff shortages across the system. Moreover, Dr. Velazquez was responsible for additional administrative duties related to her appointments as a JOLT member and Chair of the Workforce Management Committee for Resilience and Recovery.

147.    Additionally, other doctors at UM with malpractice cases and professionalism issues on their records, which are more egregious concerns than volumes of clinical work, have been routinely recredentialed under standard OPPE without special monitoring. UM targeted Dr. Velazquez for humiliating exceptional oversight to retaliate against her and undermine her career.

148.    Dr. Velazquez contacted the UHealth Board on November 30, 2022, to request that it use its oversight function to recommend OPPE rather than restricted FPPE recredentialing. Even before the Board acted on recredentialing, UM pushed back, asserting that Dr. Velazquez chose her own clinical volume metrics and was stuck with them; it claimed that it was obliged to punish her for falling short. This assertion is contrary to standard UM practice that strict volume requirements do not apply to executive doctors with extensive non-clinical oversight duties, like Dr. Velazquez. In addition, UM has failed to engage on the issue she raised of comparator physicians who have been treated better than her.

149.    Curtailing Dr. Velazquez's credentials not only reduces her ability to work at UM, it degrades her reputation throughout the medical field, and will prevent her from seeking other employment. Even if the Board proceeds with unrestricted OPPE recredentialing, the initial recommendation of FPPE and proctoring has harmed her reputation among other chairs—a critical peer group within the small community of academics who can influence her future prospects.

### C.    Mistreatment During Approved FMLA Leave

150.    As a result of UM's conduct, Dr. Velazquez began to suffer from deteriorating psychological and physical health—specifically severe stress and anxiety that caused her chest pain, tachycardia, labile blood pressure, nausea, and gastric mucosal erosions due to acute erosive gastritis. At the recommendation of her doctors, Dr. Velazquez took two months of FMLA leave beginning in November 2022 in order to alleviate these conditions.

151.    But on December 15, 2022, while Dr. Velazquez was on leave, UM contacted her to object to her communicating with department staff, even though the only purpose of her communication was to ensure that the department continued to function smoothly in her absence. In reality, UM was not trying to protect the integrity of her leave but to freeze her out of leadership,

undermine her authority, and ultimately remove her as Department Chair and Surgeon-in-Chief.

152.    During Dr. Velazquez's FMLA-protected leave, UM stopped paying her administrative salary that she received as Department Chair/Surgeon-in-Chief. This is contrary to how UM has treated male and non-Latin employees who have taken medical leave. Then with barely two weeks left in Dr. Velazquez's FMLA leave, UM took the additional unprecedented step of appointing Dr. Laurence Sands as the Interim Chair of the Department of Surgery.

153.    It is a highly irregular to withhold salary and appoint an interim chair while a department chair is on temporary medical leave. This is something that UM has not done for any other chair in similar circumstances. It turned out that this action was merely a prerequisite to entirely removing and replacing Dr. Velazquez on the day she returned from protected leave.

154.    In trying to assert a moratorium on any communication and unceremoniously appointing an interim chair plus withholding large portions of her salary, UM transformed her legally protected medical leave into a punitive administrative measure.

### D.    UM Fires and Humiliates Dr. Velazquez on the Day that She Returns from FMLA Leave

155.    Finally, on January 12, 2023, the day that Dr. Velazquez returned from FMLA leave, UM executed the coup de grace and inflicted its latest humiliation upon her. HR called her into a meeting and informed her that she was being terminated and removed as Department Chair and Surgeon-in-Chief —purportedly for not meeting the terms of UM's discriminatory and retaliatory PIP. Immediately after the meeting, HR sent an email to the entire institution stating that "effective today," she was no longer the Chair or Surgeon-in-Chief and that Dr. Sands would take over her positions while a national search was conducted. UM's actions in removing Dr. Velazquez from the premises and notifying the entire school that she had been terminated effective immediately sent a clear and wholly false message that she had engaged in serious misconduct.

156.    By prohibiting Dr. Velazquez from doing unsupervised surgeries, by removing her as Department Chair and Surgeon-in-Chief, and by unceremoniously informing her colleagues that she was stripped of these positions, UM has deprived her of her career and livelihood and irreparably damaged her professional reputation and standing. Her earning potential, to say nothing of her mental and physical health, has been permanently harmed. There is no legitimate justification for UM's actions; UM was driven by discriminatory and retaliatory animus.

**IV.    Dr. Velazquez Now Fears Further Retaliatory Actions from UM, Including Having Her Medical Credentials Revoked and Being Divested of Tenure. UM's Criticisms of Dr. Velazquez Are Pretextual Excuses to Underpay and Ultimately Remove Her**

157.    None of UM's allegations against Dr. Velazquez are supported by fact.

158.    First, it is wholly implausible that the UHealth Board of Directors would even have a role in directly assessing the job performance of a department chair and Surgeon-in-Chief. At any other leading institution, a board does not intercede in day-to-day operations but, instead, defers to institutional leadership.

159.    Here, if the Board has any actual thoughts about Dr. Velazquez's performance, they would be influenced by and result from Dr. Parekh's unlawful discriminatory and retaliatory animus, namely: (1) his preference for Dr. Merchant, a non-Latin male, to serve as Surgeon-in-Chief in place of Dr. Velazquez, a Latin/Hispanic woman; and (2) his retaliation campaign against Dr. Velazquez for complaining to the CEO about his gender discrimination and reporting other safety and procedural infractions.

160.    Second, each of the alleged shortcomings raised by Dr. Parekh and Ms. Mincey at the evaluation review is rebutted by the facts.

161.    UM's description of Dr. Velazquez being misaligned with leadership is at odds with the University appointing and keeping her on JOLT and appointing her chair of the Workforce

Management Committee during the height of the COVID-19 crisis. Instead, it refers to her objections and complaints about discrimination and health and safety violations.

162. The allegations are further rebutted by Dr. Velazquez's 2020 reappointment as Surgeon-in-Chief with overwhelming faculty approval and her department's banner-year performance in 2022.

163. The claim that Dr. Velazquez was "inappropriate" or "relentless" is vague and conclusory and made with no reference to specific events. It is thinly veiled code for her failure to conform to gender stereotypes and her engagement in protected activity. Moreover, it is a characterization that is gender-biased on its face and is born of racial animus. It demonstrates that UM does not want a confident Latin/Hispanic woman in a senior role. It is also at odds with her colleagues' affectionate descriptions of her and her leadership style as well as the University having planned a public event to honor her for her fundraising.

164. As for bypassing the chain of command, this is at odds with Dr. Velazquez's official reporting structure, as put forth in her offer letter, which places both the CEO and academic dean as her direct supervisors and specifically states that as Surgeon-in-Chief, she should coordinate directly with the CEO. Further, in her role as a JOLT member, Dr. Velazquez has direct access to the CEO and all other top UM leaders.

165. It was also protected activity for Dr. Velazquez to report discrimination and safety violations to the individuals who could best address the infractions, and she could not be expected to limit her complaints about the COO's misconduct to the COO himself (or those reporting to him and therefore beholden to him). It was Dr. Velazquez's obligation to report discrimination, retaliation, and safety violations.

166.     Furthermore, certain communications, like Dr. Velazquez expressing her concerns about Dr. Merchant's repeated medical errors and about Dr. Parekh's attempt to force open a clinic on a Sunday even though it was unsafe to do so, are legally protected activities in which any employee must be free to engage.

167.     The entire basis of Dr. Velazquez's PIP was pretextual. Each of the alleged shortcomings are ungrounded in fact or are actually clearly protected activity. Dr. Parekh has demonstrated personal bias and has maintained a pattern of discriminatory and retaliatory treatment towards Dr. Velazquez from the time that he became COO in 2020.

**V.     UM's Conduct Has Caused Irreparable Career, Psychological, and Physical Harm**

168.     UM's aggressive campaign to force Dr. Velazquez to resign, subvert her credentials, remove her as Department Chair and Surgeon-in-Chief, and scar her professional reputation will adversely affect her ability to ever obtain a similar position in an equivalent facility.

169.     There are very few Surgeon-in-Chief opportunities available in the country.

170.     All other comparable facilities to UM are well-aware of the reputations of UM's senior personnel.

171.     Because of the conduct described above and its impact on her recredentialing and reputation, no equivalent facility is likely to ever award Dr. Velazquez her current title again.

172.     This is the very point in Dr. Velazquez's career when she is and should continue to be recognized for her outstanding contributions to medicine. Her career is at its apogee.

173.     When Dr. Velazquez relocated to Miami in 2007, she moved her entire family and planned to stay through retirement. Barring Defendants' conduct, she would remain at the top of her field for another 20 years or more.

174.     UM's retaliatory campaign and Dr. Parekh's persistent attacks and unwarranted

accusations reveal that UM is determined to force Dr. Velazquez into premature retirement.

175.     By subjecting Dr. Velazquez to higher expectations than any equivalent employee, falsely and maliciously accusing her of violating unwritten or made-up rules, imposing a PIP as a pretext to force her out of her job, and cutting off her compensation and leadership positions as Department Chair and Surgeon-in-Chief, UM has directly caused Dr. Velazquez to suffer from stress and anxiety levels above the breaking point.

176.     Following the August 25th evaluation review, Dr. Velazquez was required to undergo emergency hospitalization three times as a direct result of the oppressive working conditions imposed by UM. She came to the ER with symptoms including severe chest pain. Compared to prior echocardiograms, her echocardiogram showed further heart valve regurgitation, indicating a concern of ongoing deterioration. The doctors diagnosed Dr. Velazquez with acute erosive gastritis, labile hypertension, supraventricular tachycardia, severe stress-induced physical exhaustion, and reactive anxiety. Labile blood pressure and severe stress are well known to be detrimental to heart valve function. The doctors warned that if Dr. Velazquez failed to reduce her stress, she could ultimately suffer a fatal cardiovascular condition.

177.     Further, the doctors counseled, Dr. Velazquez could experience a progressive gastrointestinal condition leading to gastrointestinal bleeding or even gastrointestinal cancer. In particular, she had a concurrent H. Pylori infection in her stomach which is known to make it more difficult to heal any gastritis and is a risk factor for stomach cancer. Severe stress is also a risk factor for decreased immune response, making any infection difficult to clear.

178.     In short, Defendants' conduct has not only caused Dr. Velazquez severe emotional and psychological stress but placed her health and her life at significant risk.

## CAUSES OF ACTION

### Count I

### 42 U.S.C. § 1981, Discrimination

179.    Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1-178 above.

180.    Defendants denied Dr. Velazquez the same right to make and enforce contracts as enjoyed by non-Latin/Hispanic employees, including rights involving the making, performance, modification, and termination of contracts with Defendants, as well as the enjoyment of all benefits, privileges, terms and conditions of that relationship, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

181.    Defendants subjected Dr. Velazquez to a pattern of discriminatory behavior based upon her race, and substantially assisted, encouraged, condoned, and failed to remedy the continued discrimination.

182.    The pattern of discrimination continued from the beginning of Dr. Velazquez's employment as surgery Department Chair and Surgeon-in-Chief in 2015 through the filing of this Complaint. Dr. Velazquez experienced severe and pervasive racial harassment that was similar in kind, occurred with relative frequency, and was perpetrated and exacerbated by numerous supervisors, including numerous repeat bad actors such as Dr. Parekh. As a result of the continuous nature of Defendants' discriminatory conduct throughout Dr. Velazquez's employment, the harassment collectively constituted a single unlawful employment practice. Thus, Dr. Velazquez is entitled to application of the continuing violations doctrine to all violations alleged herein.

183.    Defendants intentionally discriminated against Dr. Velazquez on the basis of her race by consistently underpaying her as compared to similarly situated non-Latin/Hispanic employees and by actively diluting her authority, threatening her medical credentials, and

ultimately removing her as Department Chair and Surgeon-in-Chief. Collectively, Defendants' actions undermined Dr. Velazquez's reputation and ability to obtain other employment.

184.    UM's severe and pervasive discriminatory treatment altered the conditions of Dr. Velazquez's employment and deprived her of the full benefits of the employment relationship.

185.    Dr. Velazquez notified her superiors of this discriminatory behavior.

186.    Defendants failed to undertake prompt and effective remedial action to correct the discriminatory treatment towards Dr. Velazquez, of which they were or should have been aware.

187.    The unlawful conduct was engaged in and ratified by supervisors and managing agents of UM, who acted at all relevant times within the scope and course of their employment.

188.    Defendants committed these alleged acts maliciously and oppressively in conscious disregard for Dr. Velazquez's rights.

189.    Defendants' purported reasons for underpaying Dr. Velazquez and degrading her professional standing are pretextual.

190.    Plaintiff requests all appropriate relief under Section 1981 including back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

**Count II**

**42 U.S.C. § 1981, Retaliation**

191.    Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1-178 above.

192.    Defendants retaliated against Dr. Velazquez because she engaged in protected activities by making oral and written complaints to UM's leadership about racially discriminatory treatment, specifically being discriminated against because she is Latina/Hispanic.

193.    Defendants knew or should have known of the discrimination.

194.     Defendants' actions, through its employees, as more particularly alleged above, violated Dr. Velazquez's rights against retaliation, implicitly proscribed by § 1981, for opposing what she reasonably believed to be discrimination based on race.

195.     Defendants subjected Dr. Velazquez to adverse actions, including continued underpay, continued dilution of her authority and title, direct interference with her ability to perform required duties through the imposition of a PIP, an effort to undermine her medical recredentialing, withholding portions of her compensation and removing her as Department Chair and Surgeon-in-Chief, and a campaign to ultimately destroy her professional reputation and prevent employment in any equivalent position and institution in the future.

196.     Defendants' retaliatory conduct was the direct and proximate result of Dr. Velazquez's protected activities.

197.     Defendants' conduct was willful and wanton and performed with malice or reckless indifference to Dr. Velazquez's statutory rights.

198.     Plaintiff requests all appropriate relief under Section 1981 including back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

## Count III

### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), Race, Gender, and National Origin Discrimination

199.     Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1-178 above.

200.     UM is an employer within the definition of Title VII. UM employs over thousands of employees annually.

201.     Dr. Velazquez is an employee of UM as defined by Title VII.

202.     Defendants are Dr. Velazquez's employer within the meaning of Title VII. As her employer, they subjected her to a pattern of discriminatory behavior based upon her race, gender, and national origin and substantially assisted, encouraged, condoned, and failed to remedy the continued discrimination.

203.     The pattern of discrimination has continued from the beginning of Dr. Velazquez's employment as surgery Department Chair and Surgeon-in-Chief in 2015 through the filing of this Complaint. Defendants engaged in severe and pervasive racial and gender-based harassment perpetrated and exacerbated by numerous supervisors, including repeat bad actors such as Dr. Parekh. As a result of the continuous nature of Defendants' discriminatory conduct throughout Dr. Velazquez's employment, the harassment collectively constituted a single unlawful employment practice. Thus, Dr. Velazquez is entitled to application of the continuing violations doctrine to all violations alleged herein.

204.     Defendants intentionally discriminated against Dr. Velazquez on the basis of her race, gender, and national origin by consistently underpaying her as compared to similarly situated non-Latin/Hispanic men, placing her on an unwarranted PIP, withholding parts of her compensation, removing her as Department Chair and Surgeon-in-Chief, threatening her medical credentials, and actively diluting her authority and title. All of Defendants' actions harmed Dr. Velazquez in the workplace and undermined her professional standing.

205.     Dr. Velazquez notified her superiors of this discriminatory behavior.

206.     Defendants' purported reasons for underpaying and demoting Dr. Velazquez and interfering with her professional standing are pretextual.

207.     Defendants' discriminatory actions have and continue to cause Dr. Velazquez to suffer damages including, but not limited to, lost earnings, lost benefits, and other financial losses,

as well as humiliation, emotional and mental distress, physical injury, and the complete destruction of her lauded professional reputation.

208.    Plaintiff requests all appropriate relief under Title VII including back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

209.    Plaintiff notes that she will perfect this claim as soon as she receives a Right to Sue letter from the EEOC.

**Count IV**

**Title VII, Retaliation**

210.    Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1-178 above.

211.    Defendants retaliated against Dr. Velazquez because she engaged in protected activities by making numerous complaints to UM's management about discriminatory treatment.

212.    Defendants knew or should have known of the discrimination.

213.    Defendants subjected Dr. Velazquez to adverse actions, including continued underpay, continued dilution of her authority and title, direct interference with her ability to perform required duties through the imposition of a PIP, an effort to undermine her medical recredentialing, withholding her compensation, terminating her and replacing her as Department Chair and Surgeon-in-Chief, and a campaign to destroy her professional standing and prevent her from obtaining employment in any equivalent position and institution.

214.    Defendants' retaliatory conduct was the direct and proximate result of Dr. Velazquez's protected activities.

215.    Plaintiff requests all appropriate relief under Title VII including back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

216.     Plaintiff notes that she will perfect this claim as soon as she receives a Right to Sue letter from the EEOC.

**Count V**

**Florida Civil Rights Act of 1992, Fla. Stat. § 760 *et seq.*, Discrimination**

217.     Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1-178 above.

218.     Dr. Velazquez is a member of a protected class under the FCRA.

219.     Defendants discriminated against Dr. Velazquez with respect to compensation, terms, conditions, and privileges of her employment because of her race, gender, and national origin, in violation of the FCRA.

220.     Defendants subjected Dr. Velazquez to a pattern of discriminatory behavior based upon her race, gender, and national origin and substantially assisted, encouraged, condoned, and failed to remedy the continued discrimination.

221.     The pattern of discrimination has continued from the beginning of Dr. Velazquez's employment as surgery Department Chair and Surgeon-in-Chief in 2015 through the filing of this Complaint. Defendants engaged in severe and pervasive racial and gender-based harassment that was similar in kind, occurred with relative frequency, and was perpetrated and exacerbated by numerous supervisors, including repeat bad actors such as Dr. Parekh. As a result of the continuous nature of Defendants' discriminatory conduct throughout Dr. Velazquez's employment, the harassment collectively constituted a single unlawful employment practice. Thus, Dr. Velazquez is entitled to application of the continuing violations doctrine to all violations alleged herein.

222.     Defendants intentionally discriminated against Dr. Velazquez on the basis of her race, gender, and national origin by consistently underpaying her as compared to similarly situated men of different races and national origins, and actively diluting her authority and title, placing

her on an unwarranted PIP, withholding parts of her compensation, threatening to withdraw her medical credentials, and terminating and replacing her as Department Chair and Surgeon-in-Chief. Collectively, Defendants' actions severely undermined Dr. Velazquez's professional reputation.

223.    Defendants' severe and pervasive discriminatory treatment altered the terms and conditions of Dr. Velazquez's employment.

224.    Dr. Velazquez notified her superiors of this discriminatory behavior.

225.    Defendants failed to take prompt and effective remedial action to correct the discriminatory treatment towards Dr. Velazquez, of which they were or should have been aware.

226.    Defendants retained all employees who exhibited discriminatory conduct toward Dr. Velazquez and did so despite the knowledge of said employees engaging in such actions.

227.    The unlawful conduct was engaged in and ratified by supervisors and managing agents of UM, who acted at all relevant times within the scope and course of their employment.

228.    Defendants committed the acts herein alleged maliciously and oppressively in conscious disregard of Dr. Velazquez's rights.

229.    Defendants' purported reasons for underpaying and interfering with her professional standing are pretextual.

230.    Plaintiff requests all appropriate relief under the FCRA including back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

**Count VI**
**FCRA, Retaliation**

231.    Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1-178 above.

232.    Dr. Velazquez is a member of a protected class under the FCRA.

233.    Defendants retaliated against Dr. Velazquez because she engaged in protected

activities by submitting numerous complaints to UM's leadership about discriminatory treatment.

234.   Defendants subjected Dr. Velazquez to adverse actions, including continued underpay, continued dilution of her authority and title, direct interference with her ability to perform required duties through the imposition of a PIP, an effort to undermine her medical recredentialing, withholding her compensation and removing her from her positions as Department Chair and Surgeon-in-Chief, and a campaign to ultimately destroy her professional reputation to prevent her from obtaining employment in any equivalent position and institution in the future.

235.   Defendants' retaliatory conduct was the direct and proximate result of Dr. Velazquez's protected complaints.

236.   Defendants' conduct was willful and in disregard of Dr. Velazquez's right to engage in legally-protected activities.

237.   Defendants and its supervisory personnel were aware that retaliation for making complaints of discrimination on the basis of race, gender, and national origin was unlawful but acted in reckless disregard of the law.

238.   Defendants' conduct was willful and wanton and performed with malice or with reckless indifference to Dr. Velazquez's statutory rights.

239.   Plaintiff requests all appropriate relief under the FCRA including back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

**Count VII**

**Florida's Private Whistleblower's Act, Fla. Stat. §§ 448.101–104, Retaliation**

240.   Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1-178 above.

241.   At all relevant times material, Defendants were corporations that employed 10 or more persons and, accordingly, were "employers" as defined by the FPWA.

44

242.     At all relevant times, Dr. Velazquez was a person who performed services for and under the control and direction of Defendants for wages or other remuneration and, accordingly, was an "employee" as defined by the FPWA.

243.     At all relevant times, Defendants' conduct was in violation of one or more laws, rules, or regulations, including but not limited to statutes and regulations, Fla. Stat. §§ 456.072, 458.331 & 766.110, rules imposed by UM's CIA with HHS, and other applicable federal or state laws, rules, or regulations governing or pertaining to UM, including with regard to Medicare or Medicaid requirements.

244.     Dr. Velazquez objected and refused to participate in one or more activities, policies, or practices of UM, which were in violation of one or more laws, rules, or regulations—including significant health and safety infractions that endangered patients and staff.

245.     Dr. Velazquez reported such activities, policies, or practices to supervisors and senior leadership.

246.     Because of Dr. Velazquez's objections and refusal to participate in such activities, policies, or practices, UM, took retaliatory personnel action against her as defined by the Act. In particular, it eroded her title and authority and subjected her to impossible work conditions. Ultimately, UM withheld parts of her compensation, removed and replaced her as Department Chair and Surgeon-in-Chief, and threatened to withdraw her medical credentials.

247.     Defendants are vicariously liable for the acts and omissions of its agents, servants, and employees, including but not limited to Dr. Parekh, under the doctrine of *respondeat superior* and because of their ratification of his acts and omissions.

248.     As a result of such retaliatory actions, Dr. Velazquez was demoted and terminated from her positions as Department Chair and Surgeon-in-Chief. Her professional standing is forever

ruined, such that she will be unable to secure an equivalent position.

249.     Plaintiff requests all appropriate relief under the FPWA including back pay, front pay, compensatory damages, punitive damages, and attorney's fees and costs.

**Count VIII**

**Violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601, *et seq.***

250.     Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1-178 above.

251.     Dr. Velazquez suffered from a serious health condition. She was eligible in all respects under the FMLA for protected medical leave and was approved for such leave.

252.     Under the FMLA, employees are entitled to take protected medical leave without suffering repercussions for doing so. Here, Plaintiff Velazquez took approved leave to address serious medical issues she was experiencing. Defendants interfered with her protected leave and retaliated against her for taking leave by appointing an interim Chair and discontinuing a portion of her compensation while she was out on leave and by terminating her as Department Chair and Surgeon-in-Chief on the day that she returned. Dr. Velazquez was entitled to her stipend as Chair even when on approved leave and Defendants were not permitted to withhold it. Moreover, Defendants intentionally discriminated against her for taking medically necessary leave.

253.     Defendants' actions violate 29 U.S.C. § 2615(a). As a result, Dr. Velazquez is entitled to all remedies provided by 29 U.S.C. § 2617, including lost past and future compensation and benefits, liquidated damages, appropriate equitable and injunctive relief not limited to reinstatement as Department Chair and Surgeon-in-Chief, and attorney's fees and costs.

**Count IX**

**Breach of Contract/Breach of the Covenant of Good Faith and Fair Dealing**

254.    Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1-178 above.

255.    Defendants' conduct as described above also constitutes breach of contract and breach of the implied contractual covenant of good faith and fair dealing.

256.    In particular, Defendants' actions violated express and inherent terms of Dr. Velazquez's contract with UM. For example, her terms of compensation state that she was entitled to an administrative supplement for acting as Department Chair as long as her appointment as Chair of the Department of Surgery continued. But Defendants severed the stipend while she was still out on FMLA leave before purportedly terminating her as Chair.

257.    Moreover, Defendants' contract states that Dr. Velazquez was being appointed to a renewable five-year term as Department Chair. It does not indicate that she could be removed in the middle of a term or delineate any process for doing so. Instead, both the contract and Faculty Manual suggest that UM will determine whether to renew the appointment for an additional five-year period during the fourth year of the term. At such time, all voting members of each department are afforded an opportunity to express their opinions as to whether the interests of their department, profession, and the University would be best served by replacement or retention of the chair. An early evaluation is available only in limited circumstances not applicable here. Upon information and belief, the UM did not follow the requisite procedures and instead prematurely stripped Dr. Velazquez of her Department Chair and Surgeon-in-Chief positions in the middle of a term.

258.    To the extent that the Board of Trustees has authority to remove a faculty member from a Department Chair position, any such power is not purely discretionary but remains subject to all applicable University policies and by-laws. Consequently, the University must ensure that

any representations made to the Board are truthful and in compliance with its policies and by-laws, and the failure to do so constitutes a breach of UM's obligations.

259.    The absence of an express provision for removing a Department Chair mid-term does not suggest that the UM has the authority to do so at-will. Instead, the contract and Manual must be interpreted against UM as the drafter.

260.    Assuming that the Manual's Termination for Cause protocols apply to appointments as Department Chair/ Surgeon-in-Chief, Defendants did not follow them. Nor did Dr. Velazquez engage in any misconduct that would warrant termination for cause.

261.    UM incorporated its *Common Purpose and Values* document into Dr. Velazquez's contract, which defines the behaviors that the parties are expected to support and follow. Included in those are diversity values that require treating all individuals equally and with respect. UM violated these requirements by engaging in unlawful discrimination on the basis of Dr. Velazquez's race, gender, and national origin.

262.    In addition, the parties' relationship is governed by the Faculty Manual. UM failed to abide by its own Faculty Manual, regulations, and by-laws as incorporated into the parties' contract. Specifically, the University failed to follow its own protocols and procedures for recredentialing Dr. Velazquez and investigating her complaints about safety and policy violations. Additionally, UM subjected Dr. Velazquez to the professional sanction of imposing a PIP without permitting her the due process rights afforded under its procedures for reviewing complaints before the Committee on Professional Conduct. Through each of these violations, UM manipulated the process, and disregarded and set aside aspects of the policies that would have been favorable to Dr. Velazquez to reach a predetermined result for discriminatory and retaliatory reasons.

263.    The implied covenant of good faith and fair dealing protects the parties' reasonable

contractual expectations. The covenant holds parties to standards of honesty in fact and standards of reasonableness and fair dealing. It requires parties to act reasonably and in good faith when performing their contractual duties and obligations, even when exercising discretion. Here, Defendants acted arbitrarily and in bad faith to undermine Dr. Velazquez's reasonable expectations of secure employment and compensation, with any employment actions proceeding according to designated protocols and protections. By applying UM's standards and processes selectively in order to harm Dr. Velazquez, including based on unlawful discriminatory and retaliatory animus, Defendants breached the duty of good faith embodied in Fla. Stat. § 671.203.

264.    Accordingly, Plaintiff seeks all appropriate remedies for breach of contract and breach of the covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

265.    Defendants' discriminatory actions have and continue to cause Dr. Velazquez to suffer damages including, but not limited to, lost earnings, lost benefits, and other financial losses, as well as humiliation, emotional and mental distress, physical injury, and the destruction of her lauded professional reputation. She is entitled to damages in an amount to be determined at trial.

266.    Defendants performed the acts herein alleged with malice, reckless indifference, oppression, and willful disregard of Dr. Velazquez's legal rights. Dr. Velazquez is thus entitled to recover punitive damages and/or liquidated damages in an amount according to proof.

Wherefore, Plaintiff requests the following relief:

a.    Acceptance of jurisdiction of this case;

b.    A declaratory judgment that the alleged practices are unlawful and violate, among other laws, 42 U.S.C. § 1981; 42 U.S.C. § 2000(e) *et seq.*, 29 U.S.C. §§ 2601, *et seq.*; Fla. Stat. § 760 *et seq.*; and Fla. Stat. §§ 448.101 *et seq.*;

c.    A declaration that Defendants' unlawful conduct by itself renders Dr.

Velazquez's Non-Compete Agreement void and unenforceable;

d.    A permanent injunction against Defendants and their partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages established in this action;

e.    An Order restoring Dr. Velazquez to her rightful status at UM, including her positions as Department Chair and Surgeon-in-Chief;

f.    Nominal damages;

g.    Back pay, front pay, lost benefits, liquidated damages, and other damages for lost compensation and job benefits suffered by Dr. Velazquez in accordance with the proof presented at trial;

h.    Compensatory damages in accordance with the proof presented at trial;

i.    Equitable and injunctive relief to adjust Dr. Velazquez's compensation so that she is paid equitably in accordance with similarly situated male and non-Latin counterparts;

j.    Exemplary and punitive damages in an amount commensurate with Defendants' ability to pay and to deter future conduct;

k.    An award of litigation costs and expenses, including reasonable attorney's fees to Plaintiff;

l.    Pre-judgment and post-judgment interest; and

m.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable of right to a jury.

Dated: February 8, 2023                Respectfully Submitted,

David Sanford, NY Bar No. 5695671*
**SANFORD HEISLER SHARP, LLP**
2550 Fifth Avenue

Suite 1100
San Diego, CA 92103
Telephone: (619) 577-4242
Facsimile: (619) 577-4250
dsanford@sanfordheisler.com

Andrew Melzer, NY Bar No. 4270682*
Jeremy Heisler, NY Bar No. 1653484*
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas
Suite 3100
New York, NY 10019
Phone: (646)-402-5650
Facsimile: (646)-402-5651
amelzer@sanfordheisler.com
jheisler@sanfordheisler.com

Ari B. Rubin, MD Bar No. 2012180050*
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE
Suite 300
Washington, D.C. 20003
Telephone: (202) 499-5200
Facsimile: (202) 499-5199
arubin@sanfordheisler.com

Angeli Murthy, FL Bar No. 088758
**MORGAN & MORGAN, P.A.**
8151 Peters Road
Suite 4000
Plantation, Florida 33324
Telephone: (954) 327-5369
Facsimile: (954) 327-3016
amurthy@forthepeople.com

***Attorneys for Plaintiff***
*Pro Hac Vice forthcoming*