UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-cv-20497-ALTMAN/Reid

OMAIDA VELAZQUEZ,

     *Plaintiff*,

*v.*

THE UNIVERSITY OF MIAMI,[1]

     *Defendant.*

_____/

## ORDER

A surgeon sued the University of Miami ("UM"), alleging a litany of claims under federal and state law. UM now moves to dismiss all eleven counts. We referred the motion to U.S. Magistrate Judge Reid. After careful review, we **GRANT in part** and **DENY in part** the motion to dismiss.

### THE FACTS

### I.     Background

Our Plaintiff—Dr. Omaida Velazquez, a "vascular and endovascular" surgeon—"has been employed by UM since 2007." Second Amended Complaint ("SAC") [ECF No. 57] ¶¶ 5, 22. "From 2015 to January 2023," she "served as the Department of Surgery Chair and Surgeon-in-Chief." *Id.* ¶ 1. "Until August 2022," according to the SAC, "UM expressed no issues with Dr. Velazquez's performance and widely heralded her as a model leader." *Id.* ¶ 3. But after complaining about medical safety and discriminatory conduct, the SAC alleges, the Plaintiff began to suffer retaliation. *See, e.g., id.* ¶ 4 ("[F]or Dr. Velazquez, the University has been a vipers' nest of race, gender, and national origin

---

[1] One preliminary matter. The lawsuit names three defendants: the Leonard M. Miller School of Medicine, the University of Miami Health System, and the University of Miami. But the Magistrate Judge noted—and the parties agree—that the University of Miami is the *only* proper defendant in this case, since the Leonard M. Miller School of Medicine and the University of Miami Health System are *fictitious* entities owned by the University of Miami. We thus remove those two entities from the docket.

discrimination . . . . When Dr. Velazquez complained and sought redress, UM leaders launched a vengeful, retaliatory campaign against her because of her membership in protected classes and her willingness to report discrimination and safety violations."); *id.* ¶ 90 ("UM did not undertake similar adverse actions towards men who raised safety or policy violations, but it could not tolerate pushback from an outspoken Latina.").

"[I]n at least January 2021," the SAC tells us, the Plaintiff reported "incidents involving non-Latino male Physician A between 2018 and 2022 that were improperly reported." *Id.* ¶¶ 89, 95; *see also id.* ¶ 95 ("Many of these incidents involved gross medical errors, and others involved ethical and procedural violations."). "[I]n February . . . 2022," the Plaintiff complained about "her discriminatory pay." *Id.* ¶ 89; *see also id.* ¶ 76 ("[I]n April 2022, Dr. Velazquez learned . . . that Dr. [Dipen] Parekh," the Defendant's COO, "intended to promote oncology surgeon Dr. Nipun Merchant to Surgeon-in-Chief of surgical oncology . . . in complete disregard of Dr. Velazquez's conjoined Department Chair and Surgeon-in-Chief roles."); *id.* ¶ 79 ("[L]eadership promoted Dr. Merchant to the job of 'Chief Surgical Officer,' a previously unheard-of title, . . . apparently permitt[ing] UM to pay Dr. Merchant a higher salary than Dr. Velazquez.").

On "April 20, 2022," Dr. Velazquez told Joseph Echevarria, the Defendant's CEO, that "she was being penalized for being female and that Dr. Merchant was being treated more favorably because he was male." *Id.* ¶ 120; *see also id.* ¶ 85 ("Around the end of April 2022, Dr. Velazquez contacted the CEO and expressly objected that she was being mistreated because she is a woman."). That same month, she reported "safety concerns when Dr. Parekh attempted to force a doctor to open a clinic that was closed and unstaffed in order to seek special treatment for Dr. Parekh's spouse." *Id.* ¶ 89; *see also id.* ¶ 104 (alleging that Dr. Parekh tried to "open an unstaffed ambulatory clinic to perform surgery on [his] wife's abscessed tooth"). In "late-July 2022," the Plaintiff next reported "false allegations made by Dr. Parekh in the recredentialing process of a surgeon." *Id.* ¶ 89; *see also id.* ¶¶ 112–14 (alleging

2

that the Plaintiff supported the recredentialing of Dr. Gustavo Leon, "a Latino male" surgeon," but that Dr. Parekh "blocked any vote" and "grossly misrepresented events," leading to Dr. Leon's "suspen[sion]"); *id.* ¶ 115 ("In late-August, . . . Head of Risk Management Steve Stark strongly urged Dr. Velazquez to convince Dr. Leon to resign instead of appealing his suspension . . . . When Dr. Velazquez resisted, Mr. Stark said that she 'wouldn't want to die on this hill.'"). And "again in July 2022," the Plaintiff expressed "safety concerns involving Physician A's medical errors." *Id.* ¶ 89.

"On August 12, 2022, leading up to her annual evaluation, Dr. Velazquez emailed Dean [Henri] Ford, Dr. Parekh, HR Chief [Alison] Mincey, and the CEO regarding her concerns about being underpaid compared to the male department chairs[.]" *Id.* ¶ 121. On August 25, 2022, Dr. Velazquez attended an annual "evaluation meeting," during which Mincey allegedly "announced that the Board had lost confidence in Dr. Velazquez's leadership," "said more than once that Dr. Velazquez was 'misaligned with Leadership' and had acted 'inappropriately and relentlessly' in public meetings," "referred directly to Dr. Velazquez's reports of policy infractions to UM leadership," and "accused Dr. Velazquez of bypassing the chain of command and writing to leadership about 'trivial matters.'" *Id.* ¶¶ 128–30. "At the end of the meeting, Ms. Mincey announced that the University was putting Dr. Velazquez on a 90-day PIP, which was to begin immediately." *Id.* ¶ 132.

The Plaintiff "retained counsel on August 30, 2022." *Id.* ¶ 27; *see also id.* ¶ 137 ("Immediately after the August 25 evaluation review, Dr. Velazquez retained attorneys to represent her with respect to her discrimination and retaliation claims."). According to the SAC, "[c]ounsel promptly notified UM that Dr. Velazquez asserted and intended to pursue . . . claims, including by filing charges with the EEOC." *Ibid.*; *see also ibid.* ("Further, Dr. Velazquez, through her attorneys, sought clarification about UM's intentions and an agreement to cease any ongoing retaliation.").

"On September 15, 2022, Ms. Mincey . . . me[t] with Dr. Velazquez and presented her with the written terms of the PIP." *Id.* ¶ 139. During the meeting, Mincey allegedly "made several negative

comments related to Dr. Velazquez's heritage and nationality." *Ibid.*; *see also ibid.* ("Ms. Mincey told Dr. Velazquez that she came across as 'relentless,' which—in Ms. Mincey's opinion—was likely a 'cultural thing' or byproduct of Dr. Velazquez's 'background.' Ms. Mincey also told Dr. Velazquez to learn to 'pause between sentences' and 'take a deep breath' before speaking. In what was clearly a reference to Dr. Velazquez's status as a Latina, Ms. Mincey suggested that a coach could 'fix' Dr. Velazquez's cultural mannerisms and communication style.").

"In a letter UM sent on October 12, 2022, UM told Dr. Velazquez that it would require her to participate in a '360-degree analysis'" and "to meet with, receive coaching from, and be reviewed by Dr. Parekh[.]" *Id.* ¶ 145. "In an email on October 25, 2022, UM dug in on a portion of the PIP, asking Dr. Velazquez to choose from three external coaches to instruct her 'regarding leadership style and proper means and methods of positively interacting with staff, colleagues and management.'" *Id.* ¶ 146. On November 8, 2022, the Defendant allegedly "informed Dr. Velazquez that while other department chairs' annual incentive pay would be released promptly, her bonus was being withheld until successful completion of the PIP." *Id.* ¶ 148. On November 10, 2022, "UM sent a 'PIP check,'" "asking for compliance updates, even on portions of the PIP that Dr. Velazquez had specifically challenged[.]" *Id.* ¶ 147; *see also ibid.* ("Although Dr. Velazquez asked Dr. Parekh and Dean Ford for time to set up monthly meetings as required by the PIP, UM falsely stated that she had made no such efforts."). And, "[o]n or about November 10, 2022," the SAC continues, "UM took the unprecedented step of threatening to interfere with Dr. Velazquez's medical recredentialing by reporting that she was not meeting her clinical volume expectations." *Id.* ¶ 149; *see also id.* ¶ 155 ("As of the filing of this SAC, UM has not updated Dr. Velazquez on the status of her recredentialing.").

"As a result of UM's conduct," the SAC claims, "Dr. Velazquez began to suffer from deteriorating psychological and physical health—specifically severe stress and anxiety that caused her chest pain, tachycardia, labile blood pressure, nausea, and gastric mucosal erosions due to acute erosive

gastritis." *Id.* ¶ 156. "At the recommendation of her doctors, Dr. Velazquez took two months of FMLA leave beginning in November 2022 to alleviate these conditions." *Ibid.* On "December 15, 2022, while Dr. Velazquez was on leave, UM contacted her to object to her communicating with department staff." *Id.* ¶ 157. During that FMLA leave, "UM stopped paying her administrative salary that she received as Department Chair and Surgeon-in-Chief," a move the Plaintiff describes as "contrary to how UM has treated male and non-Latin employees who have taken medical leave." *Id.* ¶ 158. "Then, with barely two weeks left of Dr. Velazquez's FMLA leave," the SAC explains, "UM took the additional unprecedented step of appointing Dr. Laurence Sands as the Interim Chair of the Department of Surgery." *Ibid.*

On January 12, 2023, "the day that Dr. Velazquez returned from FMLA leave, . . . HR called her into a meeting to report that she was being terminated from her leadership roles and removed as Department Chair and Surgeon-in-Chief—purportedly for not meeting the terms of UM's . . . PIP." *Id.* ¶ 161; *see also ibid.* ("Immediately after the meeting, UM sent an email to the entire institution stating that 'effective today,' Dr. Velazquez was no longer the Department Chair or Surgeon-in-Chief and that Dr. Sands would take over her roles while a national search was conducted."). On January 17, 2023, the "Plaintiff, through counsel, filed charges with the EEOC." *Id.* ¶ 28. "The EEOC issued Notices of the Right to Sue on February 15 and February 21[,] respectively." *Id.* ¶ 29.

## II.    Procedural History

The Plaintiff sued the Defendant in February 2023. *See* Complaint [ECF No. 1]. In May 2023, the Plaintiff filed the First Amended Complaint [ECF No. 14]. And, in December 2023, the Plaintiff filed the operative SAC, asserting eleven counts against the Defendant. Counts I, III, and V assert discrimination claims under (respectively) 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); and the Florida Civil Rights Act ("FCRA"), FLA. STAT. § 760, *et seq. See* SAC ¶¶ 189–200, 209–19, 227–41. Count VII alleges an unequal-pay claim under the Fair

Labor Standards Act of 1938 ("FLSA"), as amended by the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. §§ 206, *et seq. See id.* ¶¶ 252–56. Counts II, IV, VI, and VIII allege retaliation claims under § 1981, Title VII, the FCRA, and the EPA, respectively. *See id.* ¶¶ 201–08, 220–26, 242–51, 257–66. Count IX advances a claim under Florida's Private Whistleblower's Act ("FWPA"), FLA. STAT. §§ 448.101–04. *See id.* ¶¶ 267–76. Count X asserts a claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq. See id.* ¶¶ 277–80. And Count XI brings a claim for "breach of contract and breach of the implied contractual covenant of good faith and fair dealing." *See id.* ¶¶ 281–91.

In December 2023, the Defendant filed a Motion to Dismiss (the "MTD") [ECF No. 58], arguing that the SAC constitutes a shotgun pleading and otherwise fails to state claims for relief. That same month, the Plaintiff filed a Response in Opposition to the MTD (the "Response") [ECF No. 59], and the Defendant submitted a Reply in Support of the MTD (the "Reply") [ECF No. 61].

In March 2024, we referred the MTD to United States Magistrate Judge Lisette M. Reid.[2] *See* Order of Referral [ECF No. 73]. In September 2024, the Magistrate Judge issued an Amended Report and Recommendation (the "R&R") [ECF No. 79], recommending that we deny the MTD in its entirety—except as to certain aspects of Count XI. *See* R&R at 22 ("Only the breach of contract and breach of duty of good faith and fair dealing, with respect to the Common Purpose and Values document should be dismissed."). That same month, the Defendant filed its Objections to the R&R (the "Objections") [ECF No. 82]. And, in October 2024, the Plaintiff filed a Response to the Objections (the "Opposition") [ECF No. 85].

---

[2] We first referred the MTD to U.S. Magistrate Judge Jacqueline Becerra. *See* January 2024 Order of Referral [ECF No. 70]. On March 4, 2024, all pre-trial non-dispositive and discovery matters were referred to U.S. Magistrate Judge Eduardo Sanchez. *See* Order of Referral [ECF No. 71]. The case was then reassigned to U.S. Magistrate Judge Lauren Fleischer Louis, *see* March 7, 2024 Order of Recusal and Order of Reassignment [ECF No. 72], before both the MTD and all pre-trial non-dispositive and discovery matters landed with Magistrate Judge Reid.

## THE LAW

"District courts must review *de novo* any part of a magistrate judge's disposition that has been properly objected to." *Finkelstein v. Mount Sinai Med. Ctr. of Fla.*, 2023 WL 6118179, at *1 (S.D. Fla. Sept. 19, 2023) (Altman, J.); *see also* FED. R. CIV. P. 72(b)(3). "When a party timely objects to a magistrate judge's report and recommendation, the district judge must make a *de novo* determination 'of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *Ibid.* (quoting 28 U.S.C. § 636(b)(1)). "But, when no party has timely objected, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Versfelt v. Sanza Food Serv., LLC*, 2022 WL 2439092, at *1 (S.D. Fla. July 5, 2022) (Altman, J.) (quotation marks omitted); *see also Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) (holding that the "[f]ailure to object to the magistrate's factual findings after notice precludes a later attack on these findings"). A "district court has broad discretion in reviewing a magistrate judge's report and recommendation." *Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009).

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Megladon, Inc. v. Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1221 (S.D. Fla. 2023) (Altman, J.) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but legal conclusions without adequate factual support are entitled to no assumption of truth." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (cleaned up).

### ANALYSIS

The MTD challenges the entirety of the SAC, arguing that all eleven counts fail to state viable claims for relief. We address each challenge below.

### I.     The Shotgun-Pleading Argument

The Defendant maintains that the SAC is a shotgun pleading. *See, e.g.*, MTD at 2 (arguing that the SAC "remains a textbook shotgun pleading, consisting of 188 paragraphs of general allegations that haphazardly are incorporated into eleven different claims (which run the employment-law gamut from race, gender and national origin discrimination to retaliation to whistleblower to contract claims). This improper incorporation of 41 pages of disjointed allegations into 11 separate counts results in a pleading that is neither short nor plain and that violates well-established Eleventh Circuit precedent. On this basis alone, dismissal with prejudice is proper."); Obj. at 11 ("In addition, the Report did not address a major defect in the Second Amended Complaint: the inclusion of different claims for relief within the same count."). As the Magistrate Judge saw it, the SAC, "although lengthy and detailed, is not a shotgun pleading because it performs a basic, primary function: notifying the Defendant of the claims against it." R&R at 6.

We largely agree. To be sure, the SAC at times includes "numerous vague and conclusory allegations." *Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021). For the most part, though, the SAC sets forth cogent allegations that "fairly notif[y] [the] [D]efendant[ ] of the claims against [it] and the supporting grounds of those claims." *Dressler v. Equifax, Inc.*, 805 F. App'x 968, 972 (11th Cir. 2020). We thus cannot say that the Plaintiff "commit[s] the cardinal sin of 'shotgun' pleading." *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, 1311 (11th Cir. 2007) (Tjoflat, J., dissenting). So, unless we say otherwise below, we decline to dismiss the SAC as a shotgun pleading and **OVERRULE** this part of the Defendant's objections.

## II.     The Discrimination Claims

Counts I, III, and V assert discrimination claims under § 1981, Title VII, and the FCRA, respectively. *See* SAC ¶¶ 189–200, 209–19, 227–41. According to the SAC, the "Defendant intentionally discriminated against Dr. Velazquez on the basis of her race, gender, and national origin by consistently underpaying her as compared to similarly situated non-Latin/Hispanic men, placing her on an unwarranted PIP, withholding parts of her compensation, removing her as Department Chair and Surgeon-in-Chief, threatening her medical credentials, and actively diluting her authority and title." *Id.* ¶ 214; *see also id.* ¶ 231 ("Defendant engaged in severe and pervasive racial and gender-based harassment that was similar in kind, occurred with relative frequency, and was perpetrated and exacerbated by numerous supervisors, including repeat bad actors such as Dr. Parekh."); *id.* ¶ 192 ("As a result of the continuous nature of Defendant's discriminatory conduct throughout Dr. Velazquez's employment, the harassment collectively constituted a single unlawful employment practice.").

The Magistrate Judge determined that, "[a]t least in this early stage of the proceedings, Plaintiff's claims of continuing violations are sufficiently pled to withstand dismissal." R&R at 9. According to the R&R, "[e]very alleged action . . . stemmed from a sole complaint"—the Plaintiff reporting "potential discrimination in another employee's recredentialing"—and "led to her eventual demotion . . . in 2023." *Ibid.* (quotation marks omitted). The R&R further noted that the Plaintiff "sufficiently identif[ies] and allege[s] sufficient facts to show that she and her comparators"—*i.e.*, "six male and/or non-Latin comparators"—"were similarly situated" and that the comparators "were treated more favorably for discriminatory reasons." *Id.* at 9–10; *see also id.* at 10 ("[A] Latina vascular and endovascular surgeon needs to show that a hospital pays a higher salary to a white male vascular and endovascular surgeon . . . . Each of the[ ] higher paid comparators was a department chair, like Plaintiff, or head of a departmental subdivision.'" (citations omitted)).

The Defendant challenges only one aspect of the R&R. "[D]espite acknowledging" the need to "establish a comparator," it contends, the R&R failed to "identify [a] requisite comparator" and focused instead on "different roles (*e.g.*, the 'head of a division with Plaintiff's department') and/or conclusory allegations not entitled to the presumption of truth (*e.g.*, someone 'with functionally equivalent titles')," even though these analogues are "insufficient." Obj. at 13 (emphasis omitted). The Plaintiff counters that, "where, as here, a complaint alleges other facts demonstrating that discrimination took place, the plaintiff is not required to identify a comparator to survive a motion to dismiss." Opp. at 10. "In any event," she adds, the Complaint "*does* identify appropriate comparators" and "specifie[s] that [the] comparators are similarly situated because they—like [the] Plaintiff—are or were department and/or division chairs at UM." *Id.* at 10–11 (emphasis added).

"Title VII of the Civil Rights Act of 1964 outlaws employment discrimination because of 'race, color, religion, sex, or national origin.'" *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943 (11th Cir. 2023) (quoting 42 U.S.C. § 2000e-2(a)(1)). "Likewise, 42 U.S.C. § 1981 prohibits employers from intentionally discriminating on the basis of race in employment contracts." *Id.* at 944; *see also Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1300 (11th Cir. 2023) ("Title VII of the Civil Rights Act of 1964 and the Florida Civil Rights Act of 1992 both make it unlawful for a private employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of her race or national origin." (cleaned up)).[3]

"To state a . . . discrimination claim under Title VII, a complaint need only provide enough factual matter (taken as true) to suggest intentional . . . discrimination." *Surtain v. Hamlin Terrace Found.*,

---

[3] Given their overlapping frameworks, we can analyze the Title VII, FCRA, and § 1981 claims together. *See Harris*, 82 F.4th at 1300 n.2 ("Claims under Title VII and the FCRA are analyzed under the same framework."); *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) ("[D]iscrimination claims . . . brought under . . . 42 U.S.C. § 1981[ ] or Title VII . . . are subject to the same standards of proof and employ the same analytical framework.").

789 F.3d 1239, 1246 (11th Cir. 2015) (quotation marks omitted); *see also ibid.* (explaining that a complaint need only "plausibly suggest that the plaintiff suffered an adverse employment action due to intentional racial discrimination"). As such, a "complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case . . . because *McDonnell Douglas's* burden-shifting framework is an evidentiary standard, not a pleading requirement." *Ibid.* (quotation marks omitted).[4]

Our Defendant doesn't challenge the R&R's finding that the Plaintiff's claims "fall within the 300-day EEOC deadline for filing discrimination claims under Title VII" or that those "claims of continuing violations are sufficiently pled to withstand dismissal." R&R at 8–9.[5] It objects instead *only* to the R&R's comparator analysis. But a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Tynes*, 88 F.4th at 946 (quotation marks omitted); *see also Burgess v. Palm Tran*, 2025 WL 2436148, at *2 (11th Cir. Aug. 25, 2025) ("[F]ailure to provide comparator evidence was not alone fatal to his claim[.]"). So, even assuming that its comparator-specific objection passes muster, the Defendant hasn't offered *any* argument that the SAC fails to adequately plead an adverse-employment action resulting from intentional discrimination. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it.").

---

[4] The *McDonnell Douglas* test involves a "burden-shifting framework." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21. "If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions," at which point "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination[.]" *Id.* at 1221.

[5] In any event, whether the continuing-violations doctrine applies is—at least for now— irrelevant. According to the SAC, the Plaintiff filed with the EEOC on January 17, 2023, making March 23, 2022, the relevant 300-day deadline. In other words, the bulk of the (alleged) discriminatory conduct occurred *after* the cut-off date.

Nor do we see any clear error in the R&R's finding on this issue. As the R&R recounts, the SAC alleges (among other things) that: (1) "between July and August 2022, UM management told Plaintiff that she 'wouldn't want to die on this hill,' when she reported potential discrimination in another employee's recredentialing"; (2) the Defendant "[t]hen . . . placed [the] Plaintiff on the PIP"; (3) the PIP involved "discriminatory aspects,'" including the Defendant "withh[olding] her bonus until she completed the program"—something that didn't happen to similarly situated white men; and (4) the Defendant then gave the Plaintiff a "demotion." R&R at 9; *see, e.g.*, SAC ¶¶ 126, 128, 132, 139 ("On August 25, 2022, Dr. Velazquez attended [an] evaluation review meeting . . . . Within moments of the meeting's start, HR . . . announced that the Board had lost confidence in Dr. Velazquez's leadership . . . . At the end of the meeting, Ms. Mincey announced that the University was putting Dr. Velazquez on a 90-day PIP . . . . On September 15, 2022, Ms. Mincey . . . presented her with the written terms of the PIP . . . [and] made several negative comments related to Dr. Velazquez's heritage and nationality. Ms. Mincey told Dr. Velazquez that she came across as 'relentless,' which—in Ms. Mincey's opinion—was likely a 'cultural thing' or byproduct of Dr. Velazquez's 'background.'"); *id.* ¶ 148 ("On November 8, 2022, UM informed Dr. Velazquez that while other department chairs' annual incentive pay would be released promptly, her bonus was being withheld until successful completion of the PIP."); *id.* ¶ 149 ("UM singled out Dr. Velazquez based on a single metric that it did not typically enforce—while routinely granting full credentials to male employees who did not meet clinical volume expectations."); *id.* ¶ 161 ("[O]n January 12, 2023, the day that Dr. Velazquez returned from FMLA leave, . . . HR called her into a meeting to report that she was being terminated from her leadership roles and removed as Department Chair and Surgeon-in-Chief—purportedly for not meeting the terms of UM's discriminatory and retaliatory PIP.").

Those allegations are sufficient at the motion-to-dismiss stage. "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions,

its task is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). "The issue is *not* whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Ibid.* (emphasis added); *see also ibid.* ("Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."). The Supreme Court has thus "rejected the argument that a Title VII complaint requires greater particularity, because this would too narrowly constrict the role of the pleadings." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002) (cleaned up).

"In order to survive summary judgment," the Plaintiff will need to "present sufficient facts to permit a jury to rule in her favor." *Lewis*, 918 F.3d at 1220. That might involve "satisfying the burden-shifting framework set out in *McDonnell Douglas*," "present[ing] direct evidence of discriminatory intent," or "demonstrat[ing] a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1220, 1221 n.6 (quotation marks omitted). But, for now, the Plaintiff need only *plausibly* allege her § 1981, Title VII, and FCRA discrimination claims. Because we find that she does, we **OVERRULE** the Defendant's objection as to the sufficiency of Counts I, III, and V.

### III.    The EPA Claim

Count VII brings an unequal-pay claim under the EPA. *See* SAC ¶¶ 252–56. It alleges that the Defendant has been "paying Dr. Velazquez, a female employee, less compensation than that paid to one or more male employees within the same institution for substantially equal work at jobs that require equal skill, effort, and responsibility, and are performed under similar working conditions." *Id.* ¶ 253; *see also ibid.* ("UM paid Dr. Velazquez less than male Surgical Department Chairs as well as male heads of subspecialties. UM also unjustifiably denied Dr. Velazquez certain forms of compensation that were awarded to her male peers."). Count VII further alleges that "[t]he differentials in pay between Dr. Velazquez and her male counterparts were not due to seniority, merit, quantity or quality

of work, or a bona fide factor other than sex"—or, "[i]n the alternative," that "such factor(s) were not reasonably applied and did not account for the entire wage differential." *Id.* ¶ 254.

These allegations, as the Magistrate Judge saw it, "are sufficient to support her claim" because the Plaintiff "alleges that UM paid Dr. Merchant, a white male doctor, a higher salary for performing equivalent *or* lesser duties" and that "male surgeons" and "surgical department chairs" performed "equal work." R&R at 12 (quotation marks omitted). Objecting to that recommendation, the Defendant argues that the R&R "credits Plaintiff's conclusory allegations" that "do not explain how Plaintiff performs a 'virtually identical' job as a male comparator." Obj. at 14. But the Plaintiff points to her allegations that the Plaintiff's "male predecessor (Dr. Alan Livingstone) as well as the male surgeon who was hired to supplant her as Surgeon-in-Chief (Dr. Merchant) were both paid more than she was as leader of the Surgery Department." Opp. at 11; *see also id.* at 11–12 ("A male predecessor and a male replacement who were both paid more to perform the *same role* as Plaintiff are obviously appropriate comparators under the EPA.").

"The EPA prohibits wage discrimination on the basis of sex and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex." *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1317 (11th Cir. 2024) (quotation marks omitted). It prohibits qualifying employers from discriminating "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for *equal* work on jobs the performance of which requires *equal* skill, effort, and responsibility, and which are performed under similar working conditions," except under certain conditions. 29 U.S.C. § 206(d) (emphases added); *see also Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018) ("A plaintiff establishes a prima facie case under the Equal Pay Act if she shows that her employer paid 'different wages to employees of opposite sexes for equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions." (cleaned up)).

14

The EPA thus proscribes a "fairly strict standard." *Baker*, 94 F.4th at 1319; *see also Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989) ("The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high."). "When Congress enacted the Equal Pay Act, it substituted the word 'equal' for 'comparable' to show that the jobs involved should be *virtually identical*, that is, they would be very much alike or closely related to each other." *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973) (cleaned up). "In interpreting the EPA, 'equal' means '*substantially equal*.'" *Wheatley v. Wicomico Cnty.*, 390 F.3d 328, 332 (4th Cir. 2004) (Wilkinson, J.) (cleaned up); *see also E.E.O.C. v. Madison Cmty. Unit Sch. Dist. No. 12*, 818 F.2d 577, 582 (7th Cir. 1987) (Posner, J.) ("The cases do not require an *absolute identity* between jobs, but do require *substantial identity*. The line is a fine, perhaps imperceptible, one." (emphases added)).

"Generally, it is not enough to simply show that the comparators hold the same title and the same general responsibility as the plaintiff." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 196 (4th Cir. 2019). But Count VII itself neglects to offer any comparators and opts instead for the conclusory allegation that "UM paid Dr. Velazquez less than male Surgical Department Chairs as well as male heads of subspecialities." SAC ¶ 253. That's not enough. "Equal pay for equal work is what the EPA requires," but Count VII rests on bare-boned allegations that "male Surgical Department Chairs as well as male heads of subspecialties" earned higher salaries. *Price v. N. States Power Co.*, 664 F.3d 1186, 1192 (8th Cir. 2011). Count VII thus doesn't adequately allege that those Surgical Department Chairs and subspeciality heads had the same duties—let alone that they engaged in *equivalent* work. *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009) ("The vague and conclusory nature of these allegations is insufficient to state a claim for relief, and will not do." (quotation marks omitted)); *see also Gordon v. Green*, 602 F.2d 743, 746 (5th Cir. 1979) (declining to accept "chaotic legal jargon in lieu of a short and plain statement").

15

But even if we were to scour the entirety of the 293-paragraph SAC for scattered references to comparators, we'd *still* be left without viable allegations. Earlier in the SAC, the Plaintiff alleges that Dr. Nipun Merchant, Dr. Alan Livingstone, Dr. Dipen Parekh, Dr. Fred Telischi, Dr. Lee Kaplan, Dr. Nestor De La Cruz, Dr. Joseph Lamelas, Dr. Rodrigio Vianna, Dr. Leonardo Mulinari, and Dr. Stephen Nimer each earned "more than Dr. Velazquez[.]" SAC ¶ 68; *see also id.* ¶¶ 56, 64, 65, 67, 76. Whereas the SAC describes the Plaintiff as a "vascular and endovascular" surgeon, however, it fails to specify what type of medicine Dr. Kaplan, Dr. De La Cruz, Dr. Vianna, Dr. Mulinari, and Dr. Livingstone practice; notes only that Dr. Nimer serves as "the director of the Sylvester Comprehensive Cancer Center"; and acknowledges that the remaining surgeons work in *other* fields—Dr. Merchant in "oncology surgery," Dr. Parekh in "Urology," Dr. Telischi in "Otolaryngology," and Dr. Lamelas in "cardiothoracic surgery." *Id.* ¶¶ 64, 67, 76 (quotation marks omitted); *see also Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006) (looking to whether "two positions are fungible"); *Cullen v. Indiana Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003) (looking to "whether a significant portion of the two jobs is identical" (quotation marks omitted)).

In sum, Count VII offers only conclusory claims while other sections of the SAC allege (at best) that *non-vascular-and-endovascular* physicians received higher wages. But "jobs do not automatically involve equal effort or responsibility even if they entail most of the same routine duties." *Wheatley*, 390 F.3d at 333 (quotation marks omitted); *see also E.E.O.C.*, 818 F.2d at 582 ("[T]here is not a single job classification such as 'head coach' or 'assistant coach'; the wage varies by the sport."). So, merely pointing to other colleagues cannot alone suffice under the EPA. *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 259 (2d Cir. 2024) ("But mere titles have little sway in EPA analysis."); *Brennan*, 479 F.2d at

238 ("[T]he standard of equality is clearly higher than mere comparability[.]").[6] We thus **SUSTAIN** the Defendant's objection as to Count VII.

### IV.    The Retaliation Claims

Counts II, IV, VI, and VIII assert retaliation claims under § 1981, Title VII, the FCRA, and the EPA, respectively. *See* SAC ¶¶ 201–08, 220–26, 242–51, 257–66. The Plaintiff alleges that she "ma[de] oral and written communications to UM's leadership about racially discriminatory treatment"; "rais[ed] allegations of unequal pay"; and, "through counsel, initiat[ed] the process of filing discrimination charges in order to pursue her claims of unequal pay." *Id.* ¶¶ 202, 260. In turn, the SAC maintains, the "Defendant engaged in adverse employment actions"—"including a retaliatory PIP, interfering with her recredentialing process, and ultimately terminating her from her leadership roles"—as "a direct and proximate result of her protected activities." *Id.* ¶¶ 261–62.

The Magistrate Judge found that these allegations stated viable retaliation claims. The R&R explained that the "Plaintiff's account of her complaints to her employer *implicitly* alleged race and national origin discrimination as well as gender." R&R at 13 (emphasis added). And it determined that

---

[6] Count VII makes no mention of statistical studies. But the Plaintiff alleges earlier in the SAC that, "[a]fter filing her Complaint, Plaintiff became aware of further evidence of rampant gender-based pay discrimination across the School of Medicine and among department chairs broadly"—namely, a study that "reveals that UM paid male clinical professors in the School of Medicine, on average, 25% more in base salary than female professors of the same rank." SAC ¶ 69. Because the Plaintiff never claims that this study compares the salaries of *surgeons*, let alone surgeons performing "the *same* work," *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1313 (11th Cir. 2018), we needn't consider whether a study alone can suffice to state an EPA claim, *see Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1135–36 (5th Cir. 1983) ("It may well be questionable whether . . . such statistics could ever suffice to make a *prima facie* case, if the proofs were otherwise insufficient, for purposes of an individual Equal Pay Act or Title VII disparate treatment suit."); *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 482 (2d Cir. 2001) ("[B]ecause plaintiff both identified a male comparator and provided statistical evidence of gender-based discrimination, we need not decide whether either type of evidence standing alone would have been sufficient to prove discrimination under the Equal Pay Act."); *Beck-Wilson*, 441 F.3d at 364 (allowing "statistical evidence of a gender-based pay disparity *in conjunction with individual comparator*" (emphasis added)); *Cullen*, 338 F.3d at 701–02 ("We need not decide today whether Dr. Cullen could base her prima facie EPA case solely on statistical evidence because the Pay Equity Study could not establish discrimination alone on these facts.").

17

the "Plaintiff connects her protected activity to UM retaliatory conduct" by alleging that she "complained about a Latino employee's recredentialing in late July and early August of 2022 and was placed on a PIP days later"; "complained of the pay disparity during her August 25 annual review, the same day she was placed on the PIP"; had "her bonus pay . . . withheld when she complained about the PIP"; and "was retaliated against while on FMLA leave when UM replaced her during her leave." *Id.* at 14–15.

The Defendant mounts two objections to this recommendation. *First*, it argues that the R&R overlooks the fact that the SAC "is devoid of any allegations about Plaintiff raising complaints of race or national origin discrimination," even though "it is well-established that generic complaints about 'discrimination' are insufficient to qualify as protected activity." Obj. at 15–16. It thus insists that "Count II and the portions of Counts IV and VI premised on race or national origin discrimination fail to state a claim." *Id.* at 16; *but see id.* at 15 (conceding that "her alleged complaints did reference gender"). *Second*, the Defendant contends that the R&R disregards "the large temporal gap between Plaintiff's alleged complaints and any purported adverse employment action (*e.g.*, the [PIP] and her demotion)." *Ibid.*; *see also ibid.* (arguing that a plaintiff who "repeatedly complains for more than one-and-a-half years before adverse action is taken . . . cannot establish the causation element of a retaliation claim").

The Plaintiff offers two responses. *First*, she maintains that she "reported race and national original discrimination (in addition to gender discrimination) multiple times," that she "engaged in protected activity when her attorneys notified Defendant that Plaintiff asserted claims of race, national origin and gender discrimination," and that "the SAC clearly identifies conduct that put Defendant on notice of race and national origin discrimination." Opp. at 12–14. *Second*, the Plaintiff deems the Defendant's causation argument "plainly illogical" because "UM's retaliation often occurred within weeks, days, or hours of Plaintiff's protected conduct." *Id.* at 14; *see also id.* at n.28 ("When Plaintiff

18

complained about discrimination in a Latino doctor's recredentialing, UM *immediately* threatened that she 'wouldn't want to die on this hill'—and then placed her on a PIP just *days* later. When Plaintiff complained about discriminatory aspects of her PIP, UM withheld her bonus pay and began interfering with her medical recredentialing within *weeks*. On August 30, 2022, Plaintiff's Counsel sent a letter to UM confirming that Plaintiff had retained legal counsel to pursue her race discrimination, national origin discrimination, gender discrimination, retaliation, and whistleblower claims. Just *two weeks later*, UM's Head of Human Resources summoned Plaintiff to a meeting to present her with the written terms of her PIP—and (during that same meeting) made derogatory comments about Plaintiff's cultural heritage and nationality[.]" (cleaned up)).

"To state a plausible retaliation claim, a plaintiff must allege that: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse action." *Amaya v. Vilsack*, 2024 WL 3509583, at *4 (S.D. Fla. July 23, 2024) (Altman, J.) (cleaned up). "A materially adverse employment action is an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*, 2022 WL 2761720, at *4 (11th Cir. July 15, 2022) (quotation marks omitted). And, "[t]o show a causal connection, the plaintiff must show that (1) the decision-maker knew of her protected activity, and (2) the protected activity and adverse action were not wholly unrelated." *Ibid.*[7]

---

[7] We've already explained that the § 1981, Title VII, and FCRA claims can be analyzed together. We now add the EPA-retaliation claim to that list. *See Hornsby-Culpepper*, 906 F.3d at 1314 & n.9 (explaining that establishing "a *prima facie* case of retaliation" for purposes of "[t]he anti-retaliation provision of the Equal Pay Act" involves showing that "(1) [a plaintiff] engaged in activity protected under the act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action"); *see also Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*, 584 F. Supp. 3d 1215, 1253 (S.D. Fla. 2021) (Ruiz, J.), *aff'd*, 2022 WL 2761720 (11th Cir. July 15, 2022) (noting that "the legal analysis is the same" for "EPA retaliation claims" and "Title VII retaliation claims").

At this stage of the case, we find that the SAC advances a plausible inference of causation. To be sure, "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). And the timeline constructed by the SAC *does* appear to contain gaps long enough to defeat causation. The Plaintiff claims, for instance, that, at the end of April 2022, she "contacted the CEO and expressly objected that she was being mistreated because she is a woman," but the closest adverse action to that event came in late August 2022, when the Defendant (allegedly) "indefinitely postponed" a "ceremony to celebrate Dr. Velazquez" and imposed a "90-day PIP." SAC ¶¶ 55, 85, 132; *see also Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough . . . as a matter of law."); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("Aside from the three month temporal proximity, Higdon has not presented any other evidence of causation . . . . Higdon, therefore, . . . cannot establish a prima facie case of retaliation.").

But we can put aside those gaps for now. If nothing else, the retaliation claims survive the MTD based on allegations about the three-month stretch between August 2022 and November 2022. That August, according to the SAC, the Plaintiff lodged complaints about her allegedly "discriminatory pay." SAC ¶ 89. Then, on August 23, 2022, the Defendant allegedly scrapped the aforementioned ceremony "out of discriminatory and retaliatory motives." *Id.* ¶ 55. And, on August 25, 2022, the SAC continues, the Plaintiff attended an evaluation review during which she was placed on a "90-day PIP, which was to begin immediately," and was told by Mincey—the Defendant's HR Chief—that "the Board had lost confidence in [her] leadership," that she was "'misaligned with leadership,'" that she "had acted 'inappropriately' and 'relentlessly' in public meetings," and that she had "bypass[ed] the chain of command [by] writing to leadership about 'trivial matters.'" *Id.* ¶¶ 128–32; *see also id.* ¶ 129

20

("The attendees also referred directly to Dr. Velazquez's reports of policy infractions to UM leadership.").

On September 15, 2022, the SAC further claims, "Mincey insisted on meeting with Dr. Velazquez and presented her with the written terms of the PIP." *Id.* ¶ 139. Those written terms allegedly contained an "unprecedented" provision that "retrospectively [withheld] bonus pay that Dr. Velazquez had already fully earned." *Id.* ¶ 140. And, "[d]uring that meeting, Ms. Mincey made several negative comments related to Dr. Velazquez's heritage and nationality." *Id.* ¶ 139. Specifically, the SAC alleges that:

> Ms. Mincey told Dr. Velazquez that she came across as 'relentless,' which—in Ms. Mincey's opinion—was likely a 'cultural thing' or byproduct of Dr. Velazquez's 'background.' Ms. Mincey also told Dr. Velazquez to learn to 'pause between sentences' and 'take a deep breath' before speaking. In what was clearly a reference to Dr. Velazquez's status as a Latina, Ms. Mincey suggested that a coach could 'fix' Dr. Velazquez's cultural mannerisms and communication style.

*Ibid.*

About a month later, on October 12, 2022, the SAC submits, "UM told Dr. Velazquez that it would require her to participate in a '360-degree analysis'" and to "receive coaching from, and be reviewed by[,] Dr. Parekh—the very person whom she had complained had engaged in a pattern of discriminatory and retaliatory conduct against her." *Id.* ¶ 145. On November 8, 2022, "UM informed Dr. Velazquez that . . . her bonus was being withheld until successful completion of the PIP." *Id.* ¶ 148. Two days later, on November 10, 2022, the Defendant allegedly "took the unprecedented step of threatening to interfere with Dr. Velazquez's medical recredentialing by reporting that she was not meeting her clinical volume expectations," even though "her clinical volumes were not significantly different from prior years when her credentials were renewed without issue" and "were not out of line with those of other UM leaders with equivalent administrative responsibilities." *Id.* ¶ 149; *see also ibid.* ("In short, UM singled out Dr. Velazquez based on a single metric that it did not typically enforce—

21

while routinely granting full credentials to *male* employees who did not meet clinical volume expectations." (emphasis added)).

Those specific allegations—spanning the months of August 2022 to November 2022—state viable claims for retaliation on the basis of gender, race, and national origin. *See id.* ¶ 89 (alleging that the Plaintiff "report[ed] her discriminatory pay" in "August 2022"); *id.* ¶ 128–31 (alleging that Mincey accused the Plaintiff on August 25, 2022, of acting "inappropriately" and "relentlessly" and of "writing to leadership about 'trivial matters'"); *id.* ¶ 139 (alleging that Mincey "made several negative comments related to Dr. Velazquez's heritage and nationality" on "September 15, 2022"). And they reflect a series of interrelated events separated by only three-to-four weeks at a time. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("For purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." (quotation marks omitted)); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (finding "seven weeks" a "timeframe sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case" (cleaned up)); *see also Gregori v. Hometown Foods USA, LLC*, 2024 WL 474374, at *7 (S.D. Fla. Feb. 7, 2024) (Altman, J.) (finding it "premature" to dismiss a "retaliation claim on temporal proximity alone without the parties having the benefit of discovery," given that complaints "need not allege facts specific to make out a prima facie case for retaliation, just enough factual matter to suggest retaliation" (quotation marks omitted)). The Defendant's objections thus fail.

That's not to say the retaliation claims have merit. Nor is it to credit those parts of the timeline that lack a temporal nexus and race- or national-origin-specific allegations. But our sole task today is to determine whether the SAC states *plausible* allegations. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that courts adjudicating motions to dismiss must assume "that all the allegations in the complaint are true (even if doubtful in fact)"); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("What

Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations."); *Vavrus v. Russo*, 243 F. App'x 561, 564 (11th Cir. 2007) ("That . . . claims survived [a] motion to dismiss does not indicate that the suit was *not* frivolous."). Because we must "draw all reasonable inferences in the plaintiff's favor," *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017), we cannot say that the Plaintiff fails to plead *any* incidents of racial or national-origin retaliation—nor can we say that she's failed to plausibly allege a causal nexus. We therefore **OVERRULE** the Defendant's objections to Counts II, IV, VI, and VIII.

## V.      The FPWA Claim

Count IX brings a claim under the FPWA. *See* SAC ¶¶ 267–76. It alleges that the Plaintiff "objected to and refused to participate in"—and "reported" to "supervisors and senior leadership"— "one or more activities, policies, or practices of UM that were in violation of one or more laws, rules, or regulations," "including significant health and safety infractions." *Id.* ¶¶ 271–72. In turn, the SAC claims, "UM took retaliatory personnel action" by "erod[ing] her title and authority," "subject[ing] her to impossible work conditions," "[withholding] parts of her compensation," "remov[ing] and replac[ing] her as Department Chair and Surgeon-in-Chief," and "threaten[ing] to restrict or withdraw her medical credentials." *Id.* ¶ 273.

The Magistrate Judge found these allegations "sufficient at this stage of the pleadings" because the SAC "enumerated multiple occasions when UM retaliated against her for reporting 'serious health and safety violations'" and included "a list of state laws she believed that UM violated." R&R at 16. Objecting to that recommendation, the Defendant advances two arguments: *one*, that "this retaliation claim fails for the same temporal reasons as her other retaliation claims"; *two*, that the SAC fails to "establish an actual violation of positive law" because the state-law violations detailed in the SAC are alleged "on information and belief," which "is insufficient to state a claim." Obj. at 17 (quotation marks omitted).

23

As to the first objection, the Plaintiff counters that "temporal proximity supports a causal inference" here. Opp. at 15; *see also ibid.* ("Plaintiff complained about Dr. Parekh's insistent attempts to unlawfully operate an oral maxillofacial and dentistry facility in February 2022, as well as discriminatory anomalies in another employee's recredentialing in July and August 2022. Only *a few days* after she reported the unlawful dental incident, Defendant retaliated by launching a pretextual HR investigation against her. And, when she reported potential discrimination in her colleague's recredentialing, Defendant *immediately* told her to back off, threatened her job, and then imposed its retaliatory PIP." (cleaned up)). And "[e]ven if there were a large temporal gap between Plaintiff's protected activity and adverse actions," the Plaintiff maintains, "other circumstantial evidence would suffice to prove causation." *Id.* at 16; *see also ibid.* ("Plaintiff alleges that Defendant's Head of Faculty Affairs and the Dean (i) warned her that Dr. Parekh was upset by her February 2022 complaint and (ii) threatened that she should not take her concerns of unsafe or unlawful practices further because it 'would be bad for her politically.' When Plaintiff objected to Defendant's attempts to interfere with the recredentialing of her Latino colleague, Defendant advised Plaintiff that she 'wouldn't want to die on this hill.'" (cleaned up)).

As to the Defendant's second objection, the Plaintiff argues that the SAC "alleges no fewer than four different state or federal laws and regulations that Defendant violated" and that these violations "*in fact* occurred." Opp. at 16. The Plaintiff adds that this "specific detail actually *exceeds* what is required for Plaintiff to plead under the FPWA" and that, in any event, alleging only that "she reasonably believed a violation of law occurred . . . would suffice to state an FPWA claim." *Ibid.* Finally, the Plaintiff insists that "the words 'information and belief' never occur in connection with Plaintiff's assertion that she believed a predicate legal violation occurred for purposes of her FPWA," and that "it cannot be that a prefatory clause of 'on information and belief' automatically requires a court to disregard an allegation in a complaint." *Id.* at 17.

"The FPWA in relevant part prohibits an employer from taking a 'retaliatory personnel action against an employee because the employee has objected to, or refused to participate in,' conduct that violates a law, rule, or regulation." *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 858 (11th Cir. 2023) (cleaned up) (quoting FLA. STAT. § 448.102(3)). "Thus, the elements of an FPWA claim are: (1) protected activity, (2) a retaliatory personnel action and (3) a causal connection between the two." *Ibid.*; *see also Jenkins v. Golf Channel*, 714 So. 2d 558, 563 (Fla. Dist. Ct. App. 1998) ("The purpose of the Whistle Blower's Act is to protect private employees who report or refuse to assist employers who violate laws enacted to protect the public.").

Starting with the first objection: We agree with the Plaintiff that temporal proximity supports a casual inference here. If nothing else, the SAC claims that the Plaintiff registered safety complaints in July 2022. *See* SAC ¶ 89 (alleging that the Plaintiff reported "safety concerns involving Physician A's medical errors" and "false allegations made by Dr. Parekh"). By August 2022, the SAC maintains, the Defendant cancelled a ceremony honoring the Plaintiff, rebuked the Plaintiff for "bypassing the chain of command and writing to leadership about 'trivial matters,'" and imposed the PIP. *Id.* ¶ 130; *see also id.* ¶¶ 55, 128–32. For the reasons we outlined above in our discussion of the retaliation claims, this timeline suffices to establish (at least at the pleading stage) a causal connection between the Plaintiff's alleged whistleblowing and the Defendant's alleged punishments.

We turn next to the second, more pressing inquiry: the adequacy of the pleading. Here, we begin with the "the critical statutory phrase": the FWPA's focus on disclosing activity "that is in violation of a law, rule, or regulation." *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 790–91 (Fla. Dist. Ct. App. 2005) (quoting § 448.102). Two elements of that language merit closer review. *First*, Florida courts have construed this phrase such that "it *must* be a legislatively enacted law, rule, or regulation," as opposed to some internal or contractual obligation. *Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 464 (Fla. Dist. Ct. App. 2015) (emphasis added). *Second*, Florida courts

25

have "determined that an employee's *belief* that a law, rule, or regulation was violated [i]s insufficient[.]" *Ibid.* (emphasis added); *see also Drozd v. Amatus Health, LLC*, 406 So. 3d 384, 386 (Fla. Dist. Ct. App. 2025) ("[T]he legislature's use of the word 'is' requires proof of an 'actual violation' of a law, rule, or regulation by the employer in this situation."); *Dos Santos v. AIDS Healthcare Found., Inc.*, 2021 WL 4972993, at *10 (S.D. Fla. Jan. 5, 2021) (Dimintrouleas, J.) ("Notably, the FWA's requirement that an employer's policy be 'in violation of a law' is unequivocal. The FWA does not provide protection to employees for 'alleged' or 'suspected' violations of the law." (cleaned up)); *Gessner v. S. Co.*, 396 So. 3d 908, 914–15 (Fla. Dist. Ct. App. 2024) (Tanenbaum, J., concurring in result and in certification of conflict) ("As a linking verb, 'is' . . . require[s] that the employer's conduct be in the *present* state of unlawfulness—as a matter of objective fact—at the time the employee supposedly acted in response. This reading stands in marked contrast to the appellant's proposed reading—*belief* that a violation has occurred, whether it has or not—which imposes a more speculative, subjective, or contingent state [.]"); *White v. Purdue Pharma, Inc.*, 369 F. Supp. 2d 1335, 1337 (M.D. Fla. 2005) ("As the provided emphasis on the word 'is' makes clear, no qualification was provided to permit shelter for the employee who reasonably believes she is being asked to engage in illegal activity."). Put plainly, a whistleblower's *suspicion* of unlawful conduct isn't enough under the FWPA.

Context confirms what the text demands. A *different* Florida whistleblower statute—involving public (not private) disclosures—specifically prohibits retaliation in response to disclosures of "[a]ny violation *or suspected violation* of any federal, state, or local law, rule, or regulation[.]" FLA. STAT. § 112.318(5)(a). Had the Florida legislature wanted the FWPA to encompass suspected violations, it could've imported that language into the FWPA. But the FWPA instead wields a narrower scope, reaching only disclosures concerning conduct "that *is* in violation of a law, rule, or regulation." § 448.102 (emphasis added). And that distinction matters. *See State v. Crose*, 378 So. 3d 1217, 1236 (Fla. Dist. Ct. App. 2024) ("[W]hen the legislature has included a provision in one statute, but omitted it in

26

an analogous statute, courts should not read it into the statute from which it has been excluded." (quotation marks omitted)); *see also Bittner v. United States*, 598 U.S. 85, 94 (2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning (*expressio unius est exclusio alterius*).").

That's not to heighten the federal-pleading standard. Stating a viable claim under the FWPA doesn't require *proving* a legal violation. "Nonetheless, courts have required a plaintiff to *allege* an actual violation in order to state a claim under the FPWA." *Kattell v. Brenntag Mid-south, Inc.*, 2019 WL 13143000, at *6 (M.D. Fla. June 11, 2019) (emphasis added); *see also Obukwelu v. Tallahassee Mem'l Healthcare, Inc.*, 2015 WL 11110552, at *3 (N.D. Fla. June 25, 2015) ("[B]ecause Ms. Obukwelu does not allege that she objected to an actual violation of law, she fails to state a claim under section 448.102(3).").

The SAC runs headlong into this problem—at least in part. True, Count IX itself alleges that, "[a]t all relevant times, Defendant's conduct was in violation" of *nine* laws, rules, or regulations: *one*, "Fla. Stat. §[ ] 456.0575 (patient safety notification requirements)"; *two*, "[FLA. STAT. §] 456.049 (insurance notification requirements)"; *three*, "[FLA. STAT. §] 395.0197 (requirement to establish risk management policies and report certain safety violations)"; *four*, "[FLA. STAT. §] 458.331 (restricting grounds for disciplinary actions against medical providers)"; *five*, "[FLA. STAT. §] 766.110 (requirement for hospitals to exercise due care in ensuring competence of medical staff and compliance with risk management policies)"; *six*, "state and federal anti-discrimination laws"; *seven*, "rules imposed by UM's CIA with HHS"; *eight*, "internal UM by-laws"; and *finally*, "other applicable federal or state laws, rules, or regulations governing or pertaining to UM, including with regard to Medicare or Medicaid requirements." SAC ¶ 270. But earlier parts of the SAC contradict three of those allegations. In reference to the purported violations of §§ 395.0197, 456.0575, and 456.049, for instance, the SAC

27

elsewhere alleges that, "*[o]n information and belief*, UM *either* never reported these major adverse events to the State Board of Medicine or the Agency for Health Care Administration, *or* it intentionally omitted [the] name . . . [of] the physician responsible." *Id.* ¶ 96 (emphases added).

That problem isn't confined to one stray sentence. Allegations throughout the SAC indicate that the Plaintiff merely harbored potential *concerns* about compliance. *Compare id.* ¶ 3 ("Dr. Velazquez complained about . . . serious health and safety *concerns*[.]" (emphasis added)), *id.* ¶ 89 ("These reports include[,] . . . in April 2022, reporting safety *concerns* when Dr. Parekh attempted to force a doctor to open a clinic that was closed and understaffed in order to seek special treatment for Dr. Parekh's spouse[.]" (emphasis added)), *id.* ¶ 93 ("She understood that under the CIA, she had a duty to report any *potential* violation of law, and that the University was prohibited from retaliating against her for any such disclosures." (emphasis added)), *id.* ¶ 95 ("Many of these incidents involved gross *medical* errors, and others involved *ethical and procedural* violations." (emphases added)), *id.* ¶ 97 ("Dr. Velazquez, *out of abundant concern for patient safety*, complained to UM leadership on multiple occasions that the University was improperly reporting such errors." (emphasis added)), *id.* ¶ 99 ("In July 2022, at credentialling committee meetings and . . . MEC . . . meetings, Dr. Velazquez again expressed *concerns* about these incidents." (emphasis added)), *id.* ¶ 101 ("This was one of many incidents fueling Dr. Velazquez's *concerns* about UM's risk management compliance." (emphasis added)), *and id.* ¶ 106 ("*Concerned* about Dr. Parekh's persistent *disregard* for safety and UM's and the CIA's compliance procedures, Dr. Velazquez immediately notified Dean Ford and the CEO of the event with Dr. Peleg as it had been reported to her." (emphases added)), *with id.* ¶ 9 ("Dr. Velazquez discovered that certain high-ranking individuals at UM were committing significant health and safety *violations* of . . . state and federal laws and regulations[.]" (emphasis added)), *id.* ¶ 10 ("Dr. Velazquez reported these *violations*[.]" (emphasis added)), *id.* ¶ 89 ("She also reported significant health and safety *violations* that could have harmed patients and staff." (emphasis added)), *and id.* ¶ 111 ("Defendant violated both the CIA and

Florida law by disregarding Dr. Velazquez's reports of unsafe conduct and abandoning its comprehensive risk management policies."); *see also* Resp. at 17 ("When she complained, Dr. Velazquez *reasonably believed* that UM violated such laws and regulations." (emphasis added)).

Even with these discrepancies, though, we must still accept the complaint's properly-pled allegations as true. We thus find that the SAC sufficiently alleges a claim under the FPWA as to §§ 458.331 and 766.110, since the SAC contains no self-conflicting allegations as to those laws. *See id.* ¶ 111 ("Defendant violated both the CIA and Florida law by disregarding Dr. Velazquez's reports of unsafe conduct and abandoning its comprehensive risk management policies. *See* Fla. Stat. §§ 395.0197, 766.110[.]"); *id.* ¶ 116 ("Florida law strictly delineates the grounds for disciplinary action against medical providers, and Dr. Velazquez was abiding by those guidelines in challenging Dr. Parekh's efforts to remove Dr. Leon. *See* Fla. Stat. § 458.331.").

But we needn't do the same when a plaintiff's "own complaint plainly contradict[s] [a] conclusory allegation." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1210 (11th Cir. 2007); *see also Campos v. I.N.S.*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998) (Gold, J.) ("Courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductible therefrom, but need not accept factual claims that are internally inconsistent[.]"). So, we cannot find that the Plaintiff states viable FPWA claims as to §§ 395.0197, 456.0575, and 456.049. Nor can we find that she adequately alleges claims as to the remaining so-called violations—*either* because she provides only vague allegations as to which (if any) actual positive laws are at issue, *see* SAC ¶ 270 (invoking "state and federal anti-discrimination laws" and "other applicable federal or state laws, rules, or regulations governing or pertaining to UM, including with regard to Medicare or Medicaid requirements"), *or* because the SAC takes aim at internal policies or contractual agreements instead of *legislatively enacted* laws, rules, or regulations, *see ibid.* (listing "rules imposed by UM's CIA with HHS" and "internal UM by-laws"); *see also In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1352 (11th Cir. 2023) ("Even

29

at the motion-to-dismiss stage, where we take all of the plaintiffs' factual allegations as true, we can only credit specific, plausible allegations—not vague and unsupported insinuations."); *Kearns*, 157 So. 3d at 466 (finding that the FWPA requires a "specific statutory violation," not merely "common law fraud"); *Villaman v. United Parcel Serv., Inc.*, 2019 WL 922704, at *7 (S.D. Fla. Feb. 8, 2019) (Altonaga, J.) ("Florida courts have routinely . . . constru[ed] the FWA as being limited to violations of laws, rules, or regulations, rather than internal policies."); *Morin v. Day & Zimmermann NPS, Inc.*, 2008 WL 2543432, at *2 (S.D. Fla. June 25, 2008) (Moore, J.) ("[T]he Rigging Procedure does not fall within the purview of the FWBA because it was created by FP&L as a procedure attendant to its business operations."); *Forrester v. John H. Phipps, Inc.*, 643 So. 2d 1109, 1111–12 (Fla. Dist. Ct. App. 1994) ("We are confident that the legislature did not intend to create a cause of action for what essentially amounts to an internal and personal dispute[.]").

*   *   *

The FPWA is a remedial statute. And "remedial statutes should be liberally construed in favor of granting access to the remedy provided by the Legislature." *Golf Channel v. Jenkins*, 752 So. 2d 561, 565–66 (Fla. 2000). But "[b]road remedial goals are not an invitation to judicial craftsmanship." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020). And the remedial nature of a statute cannot alone trump its plain meaning. *See Kearns*, 157 So. 3d at 464 ("[T]he first principle of statutory construction is that legislative intent must be determined primarily from the language of the statute." (quotation marks omitted)); *Bush v. Holmes*, 919 So. 2d 392, 398 (Fla. 2006) ("As a general rule, courts may not reweigh the competing policy concerns underlying a legislative enactment."). Given the textual restrictions, the difference between Florida's private- and public-whistleblower statutes, and the weight of Florida caselaw, we cannot overlook those parts of the SAC that allege only the *suspicion* of a legal violation. Nor can we credit allegations about unspecified legal sources, internal policies, or

30

contractual agreements. We therefore **OVERRULE** the Defendant's objection as to the allegations involving §§ 458.331 and 766.110 and **SUSTAIN** the objections as to all other aspects of Count IX.

## VI.      The FMLA Claim

Count X brings an FMLA claim. *See* SAC ¶¶ 277–80. It alleges that the Plaintiff "suffered from a serious health condition," "was eligible in all respects under the FMLA for protected medical leave," "and was approved for such leave," but that the Defendant "interfered with her protected leave and retaliated against her for taking leave by appointing an interim Chair, discontinuing a portion of her compensation while she was out on leave, and terminating her as Department Chair and Surgeon-in-Chief on the day that she returned." *Id.* ¶¶ 278–79. Count X also claims that the Defendant "with[he]ld" a "stipend" to which the Plaintiff was "entitled . . . as Chair[,] even when on approved leave," and "intentionally discriminated against her for taking medically necessary leave." *Id.* ¶ 279.

The Magistrate Judge determined that the Plaintiff adequately alleged both an interference *and* a retaliation claim. As to interference, the Magistrate Judge explained that being "barred from communicating with staff," being "unexpectedly denied a portion of . . . pay," having an "interim director" appointed in a "'highly irregular' fashion," and being "immediately terminated" after returning to work "could certainly discourage a reasonable person from taking FMLA leave." R&R at 18. As to retaliation, the Magistrate Judge found that the Plaintiff "established the requisite temporal proximity and pled sufficient facts," given that the SAC alleges that the "Plaintiff had her administrative pay reduced, and . . . was terminated the *same* day she returned to work." *Id.* at 19.

The Defendant objects to both findings. As an initial matter, it argues that Count X fails as a shotgun pleading because it "purports to allege claims for both FMLA interference and retaliation." Obj. at 9 n.7. As to interference, it notes that the "Plaintiff received all of the medical leave she requested." *Id.* at 18; *see also ibid.* ("[T]he law is clear that a Plaintiff suffers no FMLA injury when she receives all the leave she requests[.]" (cleaned up)). And, as to retaliation, the Defendant argues that

31

the R&R "is at odds with the timeline of Plaintiff's allegations," since the PIP began on "August 25, 2022," and yet the Plaintiff "did not take FMLA leave until November 2022." *Id.* at 19; *see also ibid.* ("Because Plaintiff was on 'thin ice' at the time she requested and took FMLA leave, Plaintiff cannot establish the requisite causation between her leave and any adverse action.").

The Plaintiff rejects both arguments. The interference claim survives the MTD, she tells us, because "interfering with the exercise of an employee's rights would include . . . not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Opp. at 18 (cleaned up). And the retaliation claim likewise survives, she continues, because "[w]hether Defendant had legitimate performance-based reasons for its adverse actions is a question for a later juncture in this case—not the pleadings stage." *Ibid.*; *see also ibid.* ("The fact that Plaintiff was placed on a (retaliatory) PIP in the past does not preclude her from asserting an FMLA retaliation claim.").

"The FMLA gives employees the right to 12 weeks of unpaid leave due to the birth of a child or for a serious health condition that makes the employee unable to work." *Penaloza v. Target Corp.*, 549 F. App'x 844, 847 (11th Cir. 2013). "Congress enacted the FMLA 'to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity.'" *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 865 (6th Cir. 2023) (quoting 29 U.S.C. § 2601(b)(1)–(5)). "There are two types of FMLA claims: (1) interference claims, where an employer denies or otherwise interferes with substantive rights under the FMLA; and (2) retaliation claims, where an employer retaliates against an employee for engaging in activity protected by the FMLA." *Penaloza*, 549 F. App'x at 847; *see also ibid.* ("An employee claiming interference must show she was entitled to a benefit that she was denied. An employee claiming retaliation must show that the employer's actions were motivated by an impermissible discriminatory or retaliatory animus." (cleaned up)).

32

Count X—comprising all of four paragraphs—blends together language sounding in both interference and retaliation claims. *See* SAC ¶ 279 ("Defendant interfered with her protected leave and retaliated against her[.]"). Still, the Plaintiff styles Count X as advancing only *one* claim—a "[v]iolation of the F[MLA]." *Id.* ¶¶ 277–81. To that end, it identifies five acts that (it alleges) support this undifferentiated FMLA claim: *one*, "appointing an interim Chair"; *two*, "discontinuing a portion of her compensation while she was out on leave"; *three*, "terminating her as Department Chair and Surgeon-in-Chief on the day she returned"; *four*, "withhold[ing]" her "stipend as Chair even when on approved leave"; and *five*, "intentionally discriminat[ing] against her for taking medically necessary leave." *Ibid.*

As a preliminary matter, we'll note that "a separate cause of action . . . must be pled in a separate count." *Amaya*, 2024 WL 1285162, at \*2 (quotation marks omitted); *see also Marlborough Holdings Grp., Ltd. v. Azimut-Benetti, Spa, Platinum Yacht Collection No. Two, Inc.*, 505 F. App'x 899, 907 (11th Cir. 2013) (explaining that the fact that one claim "is dependent on the merits of an underlying, predicate claim does not mean that the two claims must be pled together within a single count, in violation of the federal pleading standards"). As relevant here, interference and retaliation claims under the FMLA involve different standards. "Unlike an interference claim, an employee bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1267–68 (11th Cir. 2008) (quotation marks omitted); *see also Janczak v. Tulsa Winch, Inc.*, 621 F. App'x 528, 531 (10th Cir. 2015) ("These two theories of recovery are separate and distinct theories that require different showings, differ with respect to the burden of proof, and differ with respect to the timing of the adverse action." (quotation marks omitted)). Because the Plaintiff attempts to package *both* an interference *and* a retaliation claim into a single FMLA count, we **SUSTAIN** the Defendant's objection on that basis alone. *See ADT LLC v. Skyline Sec. Mgmt., Inc.*, 2026 WL 575122, at \*26 (S.D. Fla. Mar. 2, 2026) (Altman, J.) ("[D]iscrete claims must be pled separately, not nestled within a

33

general . . . claim." (cleaned up)); *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 980 (11th Cir. 2008) (explaining that a "shotgun pleading" contains "untold causes of action, all bunched together in one count contrary to the requirements of Federal Rule[ ] of Civil Procedure 10(b)").[8]

But we reach the same result even if we construe Count X as advancing only an *interference* claim. The Plaintiff neither alleges that the Defendant prevented her from taking her full leave nor disputes the Defendant's claim to that effect. *See* SAC ¶ 156 ("Dr. Velazquez took two months of FMLA leave beginning in November 2022[.]"); Obj. at 18 ("Plaintiff received all of the medical leave she requested[.]"). She also doesn't allege that the Defendant tried to stop her from taking FMLA leave in the first instance. *See Ziccarelli v. Dart*, 35 F.4th 1079, 1090 (7th Cir. 2022) ("Threatening to discipline an employee for seeking or using FMLA leave to which he is entitled clearly qualifies as interference with FMLA rights."). And that's the problem with her interference claim: She fails to allege that "she was denied any benefit to which she was entitled under the FMLA." *Penaloza*, 549 F. App'x at 848; *see also Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1274 (11th Cir. 2020) ("An FMLA interference claim lies if an employee can demonstrate by a preponderance of the evidence that she was entitled to an FMLA benefit *and her employer denied her that benefit.*" (emphasis added)).

---

[8] Another threshold matter: To state an interference claim, a plaintiff must allege that she cleared *all* the FMLA's procedural prerequisites. *See, e.g.*, *Avena v. Imperial Salon & Spa, Inc.*, 740 F. App'x 679, 682 (11th Cir. 2018) ("[T]o state a claim for FMLA discrimination or interference, Avena needed to plead facts showing that she had a serious health condition (pregnancy), *and* that the condition qualified for FMLA leave, which required an allegation that she gave adequate notice to Imperial."); *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1016 (8th Cir. 2013) (dismissing an interference claim because the plaintiff "d[id] not assert that she provided notice within thirty days or 'as soon as practicable under the circumstances,' or 'that she indicated when she would return'"). But Count X alleges only that the Plaintiff "was eligible in all respects under the FMLA for protected medical leave and was approved for such leave." SAC ¶ 278. Still, we'll overlook any pleading deficiencies here by construing that one sentence in the broadest possible light, particularly given that the Defendant doesn't challenge Count X on that basis.

This omission is fatal—in our Circuit and others. *See Lapham v. Walgreen Co.*, 88 F.4th 879, 895–96 (11th Cir. 2023) ("To succeed on such a claim, a plaintiff must prove that she was denied a benefit to which she was entitled under the FMLA, and that, as a result, she was prejudiced in some way that is remediable by either damages or equitable relief." (cleaned up)); *see also Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 722 (1st Cir. 2014) ("In her complaint, Carrero does not assert that defendants wrongfully denied her requests for FMLA leave."); *Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 154 (3d Cir. 2015) ("To assert an interference claim, an employee must establish, among other things, that she was denied benefits under the Act."); *Adkins v. CSX Transportation, Inc.*, 70 F.4th 785, 796 (4th Cir. 2023) ("[T]o make out an FMLA interference claim, an employee must demonstrate (1) that he is entitled to an FMLA benefit; (2) that his employer interfered with the provision of that benefit; and (3) that the interference caused him harm."); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006) ("[The employer] granted every request Stallings made to take FMLA leave; therefore, Stallings has failed to establish that [the employer] denied him a benefit to which he was entitled because he received all of the FMLA leave he requested."); *Dalpiaz v. Carbon Cnty.*, 760 F.3d 1126, 1132 (10th Cir. 2014) ("[T]he employee must show that she was prevented from taking the full 12 weeks of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave." (cleaned up)).

Resisting this conclusion, the Plaintiff argues that the Defendant embraces "far too narrow a reading of the plain language of the statute and case law." Opp. at 18. She insists that an interference claim arises whenever an employer's conduct *could* "discourage a reasonable person from taking FMLA leave" *or* denies the employee the "right to be restored to [the] same or equivalent position held before going on leave." *Id.* at 17–18 (quotation marks omitted). But, as we've noted, the SAC *doesn't* allege that the Defendant dissuaded or sought to prevent the Plaintiff's medical leave of absence. Nor does it allege that the Plaintiff returned from leave to a *different* (and *inferior*) position. To the contrary, the

35

SAC states that the Defendant stripped her of her title—as "Chair and Surgeon-in-Chief—"*on* the day that she returned," which means the Plaintiff kept her position until the end of her leave. SAC ¶ 279.

That's not to suggest an FMLA-interference claim requires the *denial* of leave. But the Plaintiff fails to offer any binding caselaw for what we might call her discouragement-as-interference theory. *See Hamilton*, 680 F.3d at 1319 ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it."). And even those Circuits that do recognize this theory look for specific conduct aimed at deterring an employee from taking FMLA-protected leave. The D.C. Circuit, for instance, has held that "an employer action with a reasonable tendency to interfere with, restrain, or deny the exercise of or attempt to exercise an FMLA right may give rise to a valid interference claim under § 2615(a)(1) even where the action fails to actually prevent such exercise or attempt." *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 165 (D.C. Cir. 2015) (quotation marks omitted). But, in reaching that conclusion, it noted that the plaintiff had alleged that her employer "expressed hostility toward requests for FMLA leave generally and her request in particular," and that, "after she had obtained a . . . leave but before she had occasion to use it," the employer "required her to take a fitness for duty exam which caused her to suffer losses[.]" *Id.* at 165–66.

No such allegations appear here. The SAC instead lists five acts in support of its FMLA claim—but none saves Count X. Three of the five alleged acts—appointing an interim Chair, "intentionally discriminat[ing] against her for taking medically necessary leave," and terminating her leadership roles "on the day she returned"—at best sound in *retaliation* and, in any event, have no bearing on the Plaintiff's ability to *take* the full FMLA leave. SAC ¶ 279. Two other acts— "discontinuing a portion of her compensation while she was out on leave" and withholding her "stipend as Chair even when on approved leave"—*could* conceivably state a plausible interference claim, but the SAC itself clarifies that the (alleged) pay cut was a result of the PIP, not the FMLA

36

leave. *See* SAC ¶ 136 ("But Defendant ultimately exploited the PIP to deny Dr. Velazquez her rightful compensation and remove and replace her as Department Chair and Surgeon-in-Chief."); *id.* ¶ 140 ("UM used the retaliatory PIP to retrospectively withhold bonus pay . . . . The applicable performance period for which the bonus was awarded was long since completed, yet UM sought to claw it back based on subsequent events, namely UM's imposition of its retaliatory PIP."); *id.* ¶ 148 ("Using a bogus PIP—first mentioned on August 25—to retroactively deprive her of compensation to which she was entitled for a prior, completed term was plainly retaliatory and done in bad faith."); *see also id.* ¶ 58 ("In addition, for six out of her seven years as Chair and Surgeon-in-Chief, UM held back either a portion or all of Dr. Velazquez's bonuses for arbitrary reasons."). Since the Plaintiff herself attributes the reduction to the *PIP*, we cannot find plausible a theory that the Defendant seized the stipend as retribution for taking FMLA leave.

The Plaintiff's five examples thus fall short. Interference claims generally require a plaintiff to allege an inability to take the requested FMLA leave—or at least *discouragement* on the part of the employer. *See, e.g.*, *Clark v. Philadelphia Hous. Auth.*, 701 F. App'x 113, 117 (3d Cir. 2017) ("An employer interferes with one's rights under the FMLA by refusing to authorize FMLA leave or by discouraging an employee from using such leave."); *Quintana v. City of Alexandria*, 692 F. App'x 122, 127 (4th Cir. 2017) ("The complaint alleges numerous instances of conduct . . . which . . . could establish that the City . . . unlawfully interfered with or denied FMLA benefits," including "failing to give proper notice or approval of Quintana's request for FMLA leave, failing to restore Quintana to her position or a substantially equivalent position, and terminating Quintana's employment while she was on FMLA qualifying leave."); *Render v. FCA US, LLC*, 53 F.4th 905, 914 (6th Cir. 2022) ("Examples of unlawful interference include refusing to authorize FMLA leave when the employee is eligible and counting FMLA leave under no-fault attendance policies." (quotation marks omitted)). Our Plaintiff didn't do

that here, so her claim cannot survive the MTD. We thus **SUSTAIN** the Defendant's objection as to Count X.

> **VII.    The Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing Claim**

Finally, Count XI brings a claim for "breach of contract and breach of the implied contractual covenant of good faith and fair dealing" on the theory that the Defendant "violated express and inherent terms of Dr. Velazquez's contract with UM." SAC ¶¶ 282–83; *see also id.* ¶¶ 281–91. Specifically, in Count XI, the Plaintiff points to five (alleged) breaches. *First*, she alleges that she "was entitled to an administrative supplement for acting as Department Chair as long as her appointment as Chair of the Department of Surgery continued," but that the Defendant "severed the stipend . . . *before* terminating her as Chair." SAC ¶ 283 (emphasis added). *Second*, she says that the Defendant "prematurely stripped Dr. Velazquez of her Department Chair and Surgeon-in-Chief positions in the middle of a term," even though her "contract . . . does not indicate that she could be removed in the middle of a term nor delineate any process for doing so." *Id.* ¶ 284. *Third*, she notes that the Defendant "violated" the "diversity values" mandated by the "*Common Purpose and Values* document" when it "engag[ed] in unlawful discrimination on the basis of Dr. Velazquez's race, gender, and national origin." *Id.* ¶ 288. *Fourth*, she claims the Defendant "failed to abide by its own Faculty Manual, regulations, and by-laws incorporated into the parties' contract" when it "recredential[ed] Dr. Velazquez and investigat[ed] her complaints about safety and policy violations." *Id.* ¶ 289. And *fifth*, she alleges that the Defendant "impos[ed] a PIP without permitting her the due process rights afforded under its procedures for reviewing complaints before the Committee on Professional Conduct." *Ibid.* In addition to these contractual breaches, Count XI also alleges that, "[b]y applying UM's standards and processes selectively to harm Dr. Velazquez, including based on unlawful discriminatory and

retaliatory animus, Defendant breached the duty of good faith embodied in Fla. Stat. § 671.203." *Id.* ¶ 290.

The Magistrate Judge recommended that these claims "proceed [ ] with respect to the offer letter and the Faculty Manual," but *not* the "Common Purpose and Values document." R&R at 21. According to the R&R, the Plaintiff sufficiently "identified provisions in the offer letter that she contends UM violated," with the exception of the Common Purpose and Values document, which "requires [the] Plaintiff"—but *not* the Defendant—"to follow these rules." *Id.* at 20–21. Objecting to the R&R, the Defendant contends that the "offer letter that forms part of her contract claim—which the [R&R] mistakenly claims [the] Plaintiff attached to her S[AC]—expressly authorizes the complained-of actions," and that the "reference to unspecified provisions of the Faculty Manual is insufficient to state a claim." Obj. at 18–19. And "[w]ithout a viable claim for breach of contract," the Defendant concludes, the Plaintiff "cannot sustain her improperly-joined-in-the-same-count claim for breach of the duty of good faith and fair dealing." *Id.* at 19.

The Plaintiff counters that, "[r]egardless of what the offer letter says, Plaintiff specifically alleged that Defendant violated the Faculty Manual when it failed to involve the UM Faculty Senate and other stakeholders in her quadrennial chair review and when it failed to comply with the Faculty Manual in terminating Plaintiff from her leadership roles." Opp. at 20 (citations omitted). She further contends that the SAC "alleges that Defendant violated the Faculty Manual when it severed her stipend while she was still Chair of the Department of Surgery." *Ibid.*; *see also ibid.* ("[T]he SAC identifies specific contractual provisions that Defendant violated. These include (i) Plaintiff's contractual grant of an administrative supplement while she was Department Chair; (ii) the Faculty Manual's requirement that all voting members of each department have an opportunity to express their opinions as to whether to retain Plaintiff in her role as Chair; (iii) the Faculty Manual's Termination for Cause protocols; (iv) the Faculty Manual's procedures for recredentialing; (v) the Faculty Manual's

39

procedures for investigating complaints about safety and policy violations; and (vi) the Faculty Manual's due process rights for reviewing complaints before the Committee on Professional Conduct." (emphasis omitted)).

"A Florida breach of contract claim requires the plaintiff to establish (1) a valid contract, (2) a material breach, (3) causation, and (4) damages." *Perez v. Owl, Inc.*, 110 F.4th 1296, 1305 (11th Cir. 2024) (quotation marks omitted). "At the pleading stage," of course, a complaint need contain only a "'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ramirez v. Paradies Shops, LLC*, 69 F.4th 1213, 1217 (11th Cir. 2023) (quoting FED. R. CIV. P. 8(a)(2)). But the degree to which a complaint must plead a breach-of-contract claim with specificity is less clear-cut. *Compare Cavalieri v. Avior Airlines C.A.*, 25 F.4th 843, 852 (11th Cir. 2022) (discussing "the erroneous notion that Plaintiffs' claim fails absent citation to an express term"), *with Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020) ("We agree that this was insufficient to state a claim because Bass has not alleged any general or specific provision of any contract that Fidelity might have breached.").[9] Fortunately, and for three reasons, we needn't wade into that debate here.

---

[9] No shortage of district-court decisions in our Circuit have embraced the view that "[i]t is appropriate to dismiss a breach of contract claim if it fails to state which provision of the contract was breached." *Cruz v. Underwriters at Lloyd's London*, 2014 WL 3809179, at *2 (M.D. Fla. Aug. 1, 2014); *see also Brown v. Cap. One Bank (USA), N.A.*, 2015 WL 5584697, at *3 (S.D. Fla. Sept. 22, 2015) (Bloom, J.) ("Although Plaintiffs allege the existence of written contract, they fail to identify the specific provision(s) of the contract Capital One allegedly breached. For this reason alone, their breach of contract claim must fail."); *Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1340 (S.D. Fla. 2012) (Moreno, J.) ("[T]o adequately allege a breach of contract claim, Plaintiffs are required to point toward an express provision in the contract that creates the obligation allegedly breached."); *Noble House, LLC v. Derecktor Fla., Inc.*, 2021 WL 4147745, at *3 (S.D. Fla. Sept. 13, 2021) (Gayles, J.) ("[A] breach of contract cannot be implied and a plaintiff must point to an express provision in the contract that creates the obligation allegedly breached."); *George v. Wells Fargo Bank, N.A.*, 2014 WL 61487, at *4 (S.D. Fla. Jan. 8, 2014) (Marra, J.) ("The Amended Complaint does not identify which provision of the permanent loan modification has been breached and therefore runs afoul of *Twombly*."); *Whitney Nat. Bank v. SDC Communities, Inc.*, 2010 WL 1270264, at *3 (M.D. Fla. Apr. 1, 2010) ("Plaintiff fa[i]ls to allege the specific provision of the contract allegedly breached. These counts are examples of 'the-defendant-unlawfully-harmed-me accusation' that *Iqbal* warned against."); *cf. Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1236 (Fla. Dist. Ct. App. 2001) ("The

*First*, the Plaintiff "did not object to the Magistrate's recommendation to dismiss her contract and covenant of good faith and fair dealing claims to the extent they arise from the 'Common Purpose and Values' document." Opp. at 3. She's thus abandoned this aspect of Count XI. *See Bradshaw v. Reliance Standard Life Ins. Co.*, 707 F. App'x 599, 604 (11th Cir. 2017) (explaining that Eleventh Circuit Rule 3–1 provides that "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1)

---

Plaintiff[ ] . . . fails to identify any specific provision of the Contract that was breached. The Plaintiff has continually asserted as a basis for its claim the breach of 'implicit' terms of the contract. However, these 'implicit' provisions have no basis in law or in fact and cannot support a cause of action for breach of contract or breach of the implied duty of good faith and fair dealing.").

Perhaps to stem that tide, the Eleventh Circuit recently "rejected the idea that a plaintiff must cite a term or terms of the contract that were allegedly breached to survive a motion to dismiss." *Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*, 147 F.4th 1341, 1349 (11th Cir. 2025) (quotation marks omitted). It explained that "we have never adopted a heightened pleading requirement for a breach of contract claim," and that "[p]lausibility is all that is required." *Ibid.* Still, the Eleventh Circuit hasn't clarified the contours of that standard. *See, e.g.*, *id.* at 1348–49 ("To be sure, Caterpillar Financial did not specifically cite the 'Events of Default' section . . . . But it all-but quoted from that section several times and attached the entire contract to its complaint." (cleaned up)); *id.* at 1348 ("So a breach of contract plaintiff must, as Caterpillar Financial did here, make a plausible allegation that the defendant did not perform as promised. It need not allege anything with particularity.").

Confusion in this realm extends beyond our Circuit. *Compare Bodenburg v. Apple Inc.*, 146 F.4th 761, 767 (9th Cir. 2025) ("To allege breach, a plaintiff must identify a specific contract provision breached by the defendant."), *with Spinosa v. Foremost Ins. Co. Grand Rapids Michigan*, 2025 WL 304530, at *1 n.2 (5th Cir. Jan. 27, 2025) ("[F]ederal law is the key to the pleading standards, and we do not require plaintiffs to plead the specific breached provision. However, even if the exact specific provision is not required, something more than conclusory comments is required as the Supreme Court made clear in *Twombly/Iqbal*." (cleaned up)); *see also Santos v. Kimmel*, 154 F.4th 30, 35–36 (2d Cir. 2025) ("Santos's complaint does not allege, in nonconclusory language, the essential terms of the parties' contract, including those specific provisions of the contract upon which liability is predicated." (cleaned up)); *Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 756–57 (8th Cir. 2021) ("Knowles failed to demonstrate these claims are rooted in a violation of any specific contract provision.").

waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions").

*Second*, the Defendant appended to its MTD the offer letter, *see* Exhibit A [ECF No. 58-1] at 2–3, to which the SAC refers, *see, e.g.*, SAC ¶ 170 ("[H]er offer letter . . . places both the CEO and academic dean as her direct supervisors and specifically states that as Surgeon-in-Chief, she should coordinate directly with the CEO."); *id.* ¶ 75 ("Dr. Velazquez's offer letter expressly states that her titles of Surgery Department Chair and Surgeon-in-Chief are 'indivisible.'"). And that letter specifies that "[a]ll Chairs serve a[t] the sole discretion of the Senior Vice President for Medical Affairs and Dean and in compliance with the Faculty Manual and other applicable University policies," and that the "administrative supplement for your role as Chair and SIC . . . will cease" "[s]hould you no longer serve in these roles." *Id.* at 2–3; *see also ibid.* ("[P]erformance in this role is subject to an annual, documented performance review as well as policies and procedures that pertain to accountability of the leadership of the Miller School of Medicine . . . . Indeed, your performance will be evaluated annually by the Senior Vice President for Medical Affairs and Dean. During your fourth year, your long term performance will be reviewed by the faculty of your Department following the procedures described in the Faculty Manual and by the Senior Vice President for Medical Affairs and Dean."). As the Defendant sees it, those terms "expressly authorize[ ] the complained-of actions." Obj. at 19. We agree.

Resisting this conclusion, the Plaintiff tries to minimize the weight of the offer letter. *See* Opp. at 20 ("Defendant cannot persuasively argue that the contracts at issue expressly authorized the actions that form the basis of Plaintiff's breach of contract and covenant of good faith and fair dealing claims." (cleaned up)). But she doesn't contest—and indeed *confirms*—that the letter forms part of her contract claim. *See* Resp. at 20 n.12 ("Plaintiff may rely on an employer's offer letter to allege contract claims when that is the operative agreement."); Opp. at 3 n.7 ("[T]he SAC identified provisions in the offer

letter that she contends UM violated." (quotation marks omitted)). She doesn't dispute—and instead appears to concede—that the letter undercuts her claim. *See id.* at 20 ("Regardless of what the offer letter says, Plaintiff specifically alleged that Defendant violated the Faculty Manual[.]" (cleaned up)). And she doesn't challenge the authenticity of the letter. *See id.* at 3 n.7 (arguing that the "court could consider [the] contract" and that "the fact that it was UM (and not Plaintiff) who attached the offer letter is inconsequential" (quotation marks omitted)).

This dooms her breach-of-contract claim as it relates to the severance of her stipend and the termination of her title. We can consider the offer letter because the SAC incorporates it. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) ("In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."). And the letter makes plain that the Plaintiff served as Chair—and received the associated stipend—at "the sole discretion" of the Defendant's leadership. Ex. A at 3.[10] We thus cannot find plausible the notion that the Defendant violated the Plaintiff's "terms of compensation" or "contract" in stripping her of her title and attendant stipend. *See Caterpillar*, 147 F.4th at 1349 ("[I]f the documents the plaintiff cites or attaches to its complaint do not actually contain the promises the plaintiff alleged were breached in his complaint, Rule 12(b)(6) dismissal is appropriate.").

---

[10] That the offer letter contemplates "procedures" for reviewing "long term performance" doesn't *erase* its earlier statement that the Plaintiff serves at "the sole discretion" of the Defendant's leadership. Ex. A at 3. To the extent the Plaintiff argues otherwise, she misapprehends the plain text of the contract. *See Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001) ("[I]t is well settled that when the terms of a voluntary contract are clear and unambiguous, the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." (cleaned up)). One clause details the standardized process for renewing the position for another five-year cycle. The other makes clear that the position remains at the discretion of the Defendant, regardless of the cycle.

*Third*, the remaining two breach-of-contract claims fail on their own terms. As to the first, Count XI contends that the Defendant "failed to follow its own protocols and procedures for recredentialing Dr. Velazquez and investigating her complaints about safety and policy violations." SAC ¶ 289. But invoking "protocols and procedures" in the abstract, untethered to a contract, isn't the same as alleging that the Defendant committed a breach of an extant (and binding) agreement. Similarly, the second claim—alleging that "UM subjected Dr. Velazquez to the professional sanction of imposing a PIP without permitting her the due process rights afforded under its procedures for reviewing complaints before the Committee on Professional Conduct"—fails to locate any contractual source other than a set of unidentified "procedures." *Ibid.* Because those two allegations fail to direct us to *any* contractual obligation, we find implausible the claim that the Defendant breached its agreement with the Plaintiff in the way it navigated her recredentialing, safety complaints, and PIP process.[11]

Given these three findings, the Plaintiff's good-faith-and-fair-dealing claim falters. "Florida contract law recognizes an implied covenant of good faith and fair dealing in every contract." *QBE Ins. Corp. v. Chalfonte Condo. Apt. Ass'n, Inc.*, 94 So. 3d 541, 548 (Fla. 2012). But "a breach of this

---

[11] The Plaintiff argues that those two allegations reference the Faculty Manual. *See* Opp. at 20 ("[T]he SAC identifies specific contractual provisions that Defendant violated," including "the Faculty Manual's procedures for recredentialing," "for investigating complaints about safety and policy violations," and "for reviewing complaints before the Committee on Professional Conduct."). We see three holes in this theory. *One*, the SAC never connects any such dots, and parties are bound by the allegations they advance in their pleadings. *See Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983) ("[A] party is bound by the admissions in his pleadings."). *Two*, context undermines the Plaintiff's reading, since the preceding sentence in the complaint mentions the "Faculty Manual," "regulations," *and* "by-laws," suggesting that those three items are distinct—and that any one of the three gives rise to the nameless "protocols and procedures" at issue here. SAC ¶ 289. *Three*, even if we read the two allegations as reliant on the Faculty Manual, the offer letter itself casts doubt on the theory that the Faculty Manual carries legal weight and functions as anything but an internal handbook. *See, e.g.*, Ex. A. at 2 ("All Chairs serve . . . in compliance with the Faculty Manual and other applicable University policies."); *ibid.* ("As a faculty member, you will have rights and responsibilities as defined in the Faculty Manual.").

covenant—standing alone—does not create an independent cause of action." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1329 (11th Cir. 2012) (quotation marks omitted). "The duty of good faith does not attach until the plaintiff can establish a term of the contract that the defendant was obligated to perform." *Alfaro v. Bank of Am., N.A.*, 2024 WL 1110945, at *5 (11th Cir. Mar. 14, 2024) (cleaned up); *see also Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.*, 710 So. 2d 573, 575 (Fla. Dist. Ct. App. 1998) ("[A] duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements."); *Ernie Haire Ford*, 260 F.3d at 1291 ("Rather than serving as an independent term within a contract, the implied covenant attaches to the performance of a specific contractual obligation." (cleaned up)). A claimant asserting a cause of action for breach of the implied covenant must allege "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." *Resnick*, 693 F.3d at 1329 (quotation marks omitted).

So, the Plaintiff's failure to state a claim for breach of contract undercuts her claims for breach of the implied covenant of good faith and fair dealing. "Under Florida law, breach of contract and breach of the covenant of good faith and fair dealing claims rise and fall together." *Prestige Ins. Grp., LLC v. Allstate Ins. Co.*, 2024 WL 621433, at *2 (11th Cir. Feb. 14, 2024); *see also Diaz v. Nationstar Mortg., LLC*, 2023 WL 334569, at *2 (11th Cir. Jan. 20, 2023) ("We have held that, under Florida law, a breach of the implied covenant of good faith and fair dealing cannot be maintained absent an allegation that an express term of the contract has been breached."). Accordingly, we **SUSTAIN** the Defendant's objections to Count XI.

## VIII.   Leave to Amend

Federal Rule of Civil Procedure 15 provides that "[a] party may amend its pleading once as a matter of course within . . . 21 days after serving it." FED. R. CIV. P. 15(a)(1)(A). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). And, as the Eleventh Circuit has made clear, "filing a motion is the proper method to request leave to amend a complaint, and that . . . motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) (cleaned up).

In responding to the MTD, the Plaintiff argues that she "should be free to amend in order to address any deficiencies that are identified by this Court after the issuance of a decision on this M[TD]." Resp. at 22. To that end, she tucks into a footnote an actual request: "If the Court agrees with Defendant that these should be pleaded as separate counts, Plaintiff requests leave to make this simple amendment." *Id.* at 4 n.1. But the Plaintiff has already *twice* amended her Complaint. She hasn't moved for leave to seek further amendments. *See generally* Docket. She hasn't suggested that the Defendant has consented to any such leave. And the R&R made no mention of granting leave to amend the elements of Count XI it found defective.

"A request for a court order must be made by motion" that "state[s] with particularity the grounds for seeking the order." FED. R. CIV. P. 7(b)(1). And "where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018) (cleaned up); *see also Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1298 (11th Cir. 2025) ("The only place that [Plaintiff] requested leave to amend was on the last page of his response in opposition to the defendants' motions to dismiss," so "it had no legal effect." (cleaned up)).

46

Case 1:23-cv-20497-RKA   Document 106   Entered on FLSD Docket 04/06/2026   Page 47 of 48

The Plaintiff disregarded our procedural requirements. Instead of moving for leave to amend, she tacked a cursory request to the end of her Response in Opposition to Defendants' MTD and did so without *any* argument as to how an amended complaint would overcome any pleading issues. Given all this, we see no reason to grant leave for a *third* amended complaint. *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court.").[12]

## CONCLUSION

After careful review, therefore, we **ORDER and ADJUDGE** as follows:

1. We **DIRECT** the Clerk to remove the "University of Miami Health System" and the "University of Miami Leonard M. Miller School of Medicine" from the docket. The University of Miami will be the sole Defendant in this case.

2. The Motion to Dismiss [ECF No. 58] is **GRANTED in part** and **DENIED in part** as set out in this Order.

3. The Magistrate Judge's Amended Report and Recommendation [ECF No. 79] is **ADOPTED in part and REJECTED in part**.

---

[12] A final point. The Defendant takes issue with what it describes as "unnecessary and inappropriate emails" between the Plaintiff and the Magistrate Judge's staff. Obj. at 6; *see also id.* at 6–7 ("[T]he University strongly objects to Plaintiff's counsel's repeated requests (first, *ex parte* through a voicemail and second, through numerous e-mails) for substantive edits to an issued ruling."). The Defendant appears to offer that objection for atmospheric purposes. *See id.* at 7 ("Beyond these irregularities, the University respectfully submits that the Report is factually and legally incorrect."). Without any actual request for relief, we'll disregard this argument and note only that "[e]x parte communications with judges are generally disfavored." *Env't Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 481 (5th Cir. 1980); *see also* Code of Judicial Conduct for United States Judges, Canon 3(A)(4) ("A judge should . . . neither initiate nor consider *ex parte* . . . communications concerning a pending or impending proceeding."); *In re Paradyne Corp.*, 803 F.2d 604, 612 (11th Cir. 1986); ("*Ex parte* communications . . . conflict with a fundamental precept of our system of justice[.]").

4. The Defendant's Objections [ECF No. 82] are **SUSTAINED in part** and **OVERRULED in part**.

5. Counts VII, X, and XI are **DISMISSED without prejudice**. Count IX is **DISMISSED without prejudice**, except as to the allegations concerning Fla. Stat. §§ 458.331 and 766.110.

6. A new trial order, setting future deadlines, is forthcoming.

**DONE AND ORDERED** in the Southern District of Florida on April 6, 2026.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record